HUNT *v.* RIVERSIDE CO-OPERATIVE CLUB.

1. MONOPOLIES—COMBINATIONS IN RESTRAINT OF TRADE—STATUTES.
   All the wholesale dealers in plumbers' supplies and a large majority of the master plumbers of Detroit and its suburbs organized a club, the rules of which provided that the wholesalers should sell to no one not a master plumber, and should sell to members at prices fixed by a certain list and charge nonmembers a higher price than members; that members would buy all their supplies of the wholesale members, and in figuring estimates on jobs would be governed by the price list supplied by the club, and submit their estimates to the secretary of the club before putting in their bids. *Held,* that the club constituted a combination in restraint of trade within the anti-trust law of 1899 (Act No. 255).[1]

2. SAME—COMBINATION AGREEMENT—CONSTRUCTION.
   The fact that several of the agreements contained in the rules of the club considered by themselves are not illegal is immaterial where they are merely steps to effect the accomplishment of an illegal object.

3. SAME—CLUB RULES—AMENDMENT.
   Amending the club rules on the eve of suit by abrogating the provisions requiring the wholesalers to discriminate against nonmembers, and requiring master plumbers not to sell labor and materials below the schedule rate, was ineffectual to remove the legal objections to the club since their object remained the same, and in determining that object the eliminated provisions may be considered.

4. SAME—CONTRACT WORK—STATUTE—CONSTRUCTION.
   The claim that the statute (Act No. 255, Pub. Acts 1899) does not apply to "contract work," i. e., in which work is done and materials furnished for a lump sum, on the theory that the statute does not prohibit regulating the price of labor, is untenable, since it does prohibit contracts which restrict competition by fixing the price of the supplies installed.

---

[1] As to illegal trusts under modern anti-trust laws, see note to *Whitwell* v. *Continental Tobacco Co.* (C. C. A. 8th C.), 64 L. R. A. 689.

5. SAME—EFFECTIVENESS OF COMBINATION.

An agreement restrictive of competition in trade is not legalized by the fact that competition is not entirely abolished by it.

6. SAME—EFFECT ON PRICES.

A combination in restraint of trade is not legalized by the fact that its effect has been to lower instead of raise prices of the commodities affected.

7. SAME—COMPLETENESS OF MONOPOLY.

That an unlawful combination of the master plumbers of a city does not include all the persons engaged in the trade has no effect to legalize it.

8. SAME—COMMON LAW.

An agreement among the dealers in certain commodities to keep the selling price thereof at a fixed or graduated figure is void at common law as against public policy.

9. SAME—LABOR—AGREEMENTS FIXING PRICE—STATUTE.

An agreement fixing and regulating the price of labor is not prohibited by the common law nor by the anti-trust law of 1899 (Act No. 255).

10. SAME—SUIT TO ENJOIN—PROSECUTING ATTORNEY—AUTHORITY.

Where the prosecuting attorney brings suit to enjoin a violation of the anti-trust law of 1899 (Act No. 255), the objection that he did not have authority, or did not prove his authority, to institute it, is a technical one which, being first raised on appeal, will be overruled.

Appeal from Wayne; Brooke and Frazer, JJ. Submitted February 9, 1905. (Docket No. 44.) Decided June 29, 1905.

Information in equity by Ormond F. Hunt, prosecuting attorney of Wayne county, against the Riverside Co-Operative Club and the Master Plumbers' Association to restrain further violation of the anti-trust law. From a decree for complainant, defendants appeal. Modified and affirmed.

*Ormond F. Hunt,* in pro. per.

*J. J. & R. T. Speed,* for defendants.

CARPENTER, J.   Section 1, Act No. 255, Pub. Acts 1899, reads as follows:

"That a trust is a combination of capital, skill or arts by two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them, for either, any or all of the following purposes:

"1. To create or carry out restrictions in trade or commerce.

"2. To limit or reduce the production, or increase or reduce the price of, merchandise or any commodity.

"3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"4. To fix any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

"5. It shall hereafter be unlawful for two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them, to make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, commodity or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves, or any purchasers or consumers, in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.   Every such trust as is defined herein is declared to be unlawful, against public policy and void."

Under the claim that the purpose of the organization of the first two named defendants was to violate the above-

quoted section, relator filed this information in equity asking a decree restraining their further operation. Defendants answered, and the case was heard in the court below on pleadings and proof. A decree was granted in conformity with the prayer of the bill. Defendants appeal to this court.

Each of said first two named defendants is an unincorporated association. The Master Plumbers' Exchange was organized in January, 1902. The Riverside Co-operative Club was organized in the following July. The members of the exchange are master plumbers doing business in the city of Detroit and its vicinity. The importance of that organization is shown by the fact that, of the 168 master plumbers doing business in Detroit, 131—and these "the most reputable" modestly states one of defendant's witnesses—are members of the exchange. The membership of the Riverside Club consists of the master plumbers belonging to the exchange and seven wholesale dealers and manufacturers in plumbers' supplies. (These seven comprise all the manufacturers and dealers in plumbers' supplies in the city of Detroit.) According to the rules and regulations of the Riverside Co-operative Club (these rules and regulations constitute an agreement between the members of said club), the price of plumbers' supplies is to be fixed by a committee consisting of one wholesaler and one master plumber. At this price the wholesale members agree to sell without discrimination to the master plumber members, and the master plumber members agree to buy their entire supplies, distributing their trade equitably, from the wholesale members. The wholesalers agree to sell only to qualified master plumbers (this includes plumbers who are not, as well as those who are, members of the club) whose names appear on a list approved by the officers of the club. They also agree to charge nonmembers 15 to 30 per cent. more than members. The master plumber members agree that they will not sell labor or material at prices below those fixed by a schedule approved by the club. The master plumbers

agree to do no contract work for, and the wholesale members agree to furnish no supplies to, one who has failed to make a satisfactory settlement with any member of the club. According to the rules and regulations of the Master Plumbers' Exchange, each member agrees—and a heavy penalty is provided for the failure to perform this agreement—that in bidding for contract work he will estimate materials according to the cost price fixed by said Riverside Club, and labor at wages specified in said rules; that he will add to these prices at least 30 per cent. for plumbers' and helpers' time, add to this total 5 per cent. to be paid to the exchange, and then add to this total at least 25 per cent. for profit. Each member also agreed to submit such estimate to the clerk of the exchange, who was also clerk of the Riverside Club. While defendants claim that the object of submitting these estimates was to correct errors of computation, there was a more important object, viz., to prevent competition and to enhance the plumbers' profit. This is shown by the following letters from the clerk to one of the members:

October 27, 1902. "I am quite anxious to have the estimates on that Penberthy Injector Company job thoroughly examined. * * * The estimates as they now stand seem to indicate that if the job had been figured fairly by all the competitors on it, you could just as well have secured it at an advance of from $250 to $400 over the price at which you did secure it. * * * In this connection I may also state that some time ago we compared the estimate of the Forrester and Cheney job. Two of these estimates were low and yours the lowest of all, seemed to be very low. We felt at the time these estimates were examined that the cost figures on the job should have been from $100 to $150 higher than your cost figure which would have given you a profit of from $120 to $180 more than you are now making on the job."

May 7, 1903. (Another letter from the clerk to the same member.)

"Referring again to the letting of that Ford job, I beg to advise you that I am sure that if I could have told Mr.

Harrigan that his figure was much too low compared with your figure and the figures of Mr. Dickson and Mr. Ryan, he would have 'pulled' his bid and have let the job go to one of the other three men."

There are other agreements between the members of these two associations, but it may be said of them that they are either inconsequential, or that they are designed to further the object shown by the agreements herein stated. The business of the various members was carried on under this agreement for more than a year, or until the filing of this bill, in December, 1903. Was this agreement forbidden by the statute?

In determining the legality of defendants' undertaking it would be confusing, rather than helpful, to examine and determine the legality of each specific agreement. If it may be said that many of these agreements, considered by themselves, are legal, it may also be said (and this will be made to appear hereafter) that these agreements are merely steps to effect the accomplishment of an illegal object, and for that reason they are also illegal. See *Pacific Factor Co.* v. *Adler*, 90 Cal. 110. The legality of defendants' undertaking is to be determined by ascertaining their central and controlling object. We cannot determine this object by looking at either organization as an entity apart from the other. The two organizations are intimately connected—so intimately that their common clerk testifies that he does not know whether the fund derived from the 5 per cent. addition to contracts by master plumbers, which aggregates $11,000, belongs to the one or to the other. The two organizations co-operate, and were intended to co-operate. As members of the Riverside Club the plumbers arrange to purchase their supplies. Under that arrangement each member secures the same prices, and prices more favorable than competing non-members can secure. As members of the Master Plumbers' Exchange, these plumbers fix the price at which they will sell these supplies. It is scarcely necessary to say that this agreement restricts, if it does not destroy, com-

petition between these members. The advantage that this arrangement gives the plumber members over the plumber nonmembers is obvious. The latter must buy their supplies either in the local markets at excessive prices, or abroad at a great disadvantage. It is scarcely necessary to say that this arrangement was designed to create, and tends to create, a practical, though possibly incomplete, monopoly in favor of the plumber members. As members of the Master Plumbers' Exchange, the plumbers fixed the prices—thereby restricting competition among themselves—at which they will sell the supplies, of which they had a practical monopoly. The manifest purpose of the two organizations, then, is to give to the master plumber members a monopoly of selling plumbers' supplies in the city of Detroit, and at the same time to restrict competition among themselves in effecting such sales.

Much stress is placed on the fact that on December 22, 1903, the day before this bill was filed, defendants' trustees, acting on the advice of their attorney, abrogated the provision which obligated wholesalers to discriminate against nonmember plumbers, and the provision which obligated master plumbers not to sell labor and material below a schedule rate. It is insisted that with these provisions eliminated nothing objectionable remains. As a matter of fact, the trustees had, under the by-laws, no authority to abrogate these provisions. Their action in undertaking to abrogate them was utterly ineffectual until approved at a meeting of defendants' members. This approval did not take place until January 5, 1904, and therefore, at the time this suit was instituted, the objectionable provisions were in full force. If the public authorities had the right to institute this suit and obtain a decree enjoining defendants from enforcing those objectionable provisions, it is difficult to believe that they were bound to dismiss their suit the moment defendants eliminated them from their plan of organization. It may well be said in such a case that the public has a right to some other security than de-

fendants' statement that they would thereafter desist from
their illegal undertaking.   But we do not base our decision
upon that proposition, for, as I shall endeavor to show,
the elimination of these objectionable provisions did not
materially change the character of defendants' undertak-
ing.   The master plumbers, though no longer obligated
to refrain from competition in selling supplies and labor,
remained obligated to refrain from free and unrestricted
competition when they installed plumbers' supplies on
contracts.   In other words, the elimination of the objec-
tionable provisions did not restore freedom of competition.
It merely limited the field of restricted competition.   After
the elimination of the provision expressly obligating the
wholesalers to discriminate against nonmembers, they
still remained bound to sell only to such nonmembers as
should be approved by the joint representatives of the
wholesalers and the master plumbers, and they also re-
mained bound to sell to the master plumbers at prices fixed
by such joint representatives.

It is obvious that by these remaining provisions the
parties to the contract may, if they choose, insure dis-
crimination in favor of the plumber members against the
plumber nonmembers.   Is it the purpose of the parties to
use these provisions to secure discriminations?   This may
be determined by considering their financial advantages
and desires.   Discrimination is certainly to their financial
advantage.   Only by such discrimination can the plumber
members control the business of selling plumbers' supplies
in the city of Detroit.   By controlling that business, both
the wholesalers and their associates, the master plumbers,
may hope to increase their trade and their profits.   Do the
parties desire discrimination?   If we have not answered
this by showing that discrimination was to their financial
advantage (and the object of the contract was to secure
financial advantage to the parties), additional evidence is
furnished by the original provision requiring discrimina-
tion.   It is true that by the advice of their counsel they

have eliminated that provision, but we may still, under the circumstances of this case, look to it as evidence of their purpose. See *Detroit Salt Co.* v. *National Salt Co.*, 134 Mich. 103. Indeed, one must be blind if he does not see that the essential object of the parties in organizing the Riverside Club was to secure such discrimination. When they struck from their rules the provision requiring discrimination they did not change that object. Their purpose remained unchanged. The only effect of eliminating the provision expressly requiring discrimination was to make discrimination an implied, instead of an expressed, part of the contract. We are warranted, therefore, in declaring that the parties now intend, by means of appropriate provisions still remaining in their contract, to secure discrimination. It should be construed in accordance with that intention. I conclude, therefore, that by the agreement between defendants they have attempted to create a monopoly in the business of selling plumbers' supplies in the city of Detroit and restricted competition among themselves.

It is insisted that agreements restricting competition "for contract work—that is to say, to work for which work is to be done and materials furnished for a certain lump sum—are not within the statute of 1899." It is true that a plumber who, under contract, installs his supplies in a building, furnishes the labor which installs said supplies; but it is also true that by the performance of his contract, the title of such supplies passes from him to the owner or occupant of the building. These supplies are thus either sold or disposed of. It is unnecessary to determine whether or not the statute prohibits contracts fixing and regulating the price of labor employed in installing the supplies sold, for it certainly does prohibit contracts which restrict competition by fixing the price of the supplies installed; and the statute was therefore violated when defendants agreed to restrict competition in contract work, for the effect and intent of that agreement was "to keep the price" of their supplies "at a fixed or graduated fig-

ure, * * * so as to * * * preclude a free and unrestricted competition among themselves."

Nor is the agreement of the master plumbers unobjectionable because it leaves some opportunity for competition between them.   They have agreed "not to sell * * * an article of merchandise * * * below a common standard figure or fixed value, * * * so as to * * * preclude a free and unrestricted competition among themselves;" and this the statute in express terms forbids. Moreover, this record warrants our saying that it is the aim and purpose of defendants (and this purpose may be accomplished by their contract) to altogether abolish competition between themselves.   But the justification for enjoining the further prosecution of defendants' undertaking does not rest upon the narrow ground that the agreement restricting competition among the master plumbers was unlawful.   As heretofore indicated, that rests upon the ground that defendants have undertaken, by means forbidden by the statute, viz., by agreeing to keep the selling price for both wholesale and retail dealers at a fixed or graduated figure, to create a monopoly in the business of selling plumbers' supplies in the city of Detroit, and to secure to themselves the profits of that monopoly.

Defendants' testimony tends to prove that, instead of raising, they have lowered, prices.   It is our duty to disregard that testimony.

"It is no answer to say that this monopoly has in fact reduced the price. * * * That policy may have been necessary to crush competition.   The fact exists that it rests in the discretion of this company at any time to raise the price to an exorbitant degree.   Such combinations have frequently been condemned by courts as unlawful and against public policy."   *Richardson* v. *Buhl*, 77 Mich., at pages 660, 661 (6 L. R. A. 457).

See, also, *People* v. *Sheldon*, 139 N. Y. 251 (23 L. R. A. 221).   Neither is it an answer to say that the monopoly created, or attempted to be created, is not a complete and perfect monopoly.

" All the authorities agree that in order to vitiate a contract or combination it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition." *U. S.* v. *E. C. Knight Co.*, 156 U. S., at page 16.

Did defendants violate the statute of 1899 when, by agreeing to keep the selling price—both the wholesale and retail selling price—at a fixed or graduated figure, they undertook to create a monopoly of the business of selling plumbers' supplies in the city of Detroit, and to secure to themselves the profits of that monopoly ? To answer this question we are not required to enter into a critical examination of the statute. At common law such an agreement was against public policy, and between the parties thereto was void. See *Richardson* v. *Buhl*, supra; *Detroit Salt Co.* v. *National Salt Co.*, supra; *Bailey* v. *Master Plumbers*, 103 Tenn. 99 (46 L. R. A. 561). If the statute of 1899 is constitutional—and its constitutionality is not questioned—it was violated by defendants when they made the arrangement set forth in this opinion. Decisions from other courts based upon statutes either precisely like or similar to our own may be cited to sustain this conclusion. See *San Antonio Gas Co.* v. *Texas*, 22 Tex. Civ. App. 118; *State* v. *Ice Co.*, 96 Tex. 461; *Harding* v. *Glucose Co.*, 182 Ill. 551; *State* v. *Armour Packing Co.*, 173 Mo. 356 (61 L. R. A. 464); *Walsh* v. *Ass'n of Master Plumbers*, 97 Mo. App. 280.

The decree in this case not only enjoined defendants from continuing the undertaking heretofore described and all similar undertakings, but it also enjoined them " from fixing and regulating, or attempting to fix and regulate, the price of labor employed in installing plumbing supplies and goods in the city of Detroit and its vicinity." This provision goes further than to enjoin defendants from fixing and regulating the price of labor employed in executing a contract for the installment of supplies unlawfully sold by them. Indeed, if it did not go further than that,

it was unnecessary to insert it in the decree, because such regulation of the price of labor is sufficiently enjoined by other provisions, viz., provisions which have the effect of enjoining defendants from proceeding with their undertaking and with all similar undertakings. The provision in question prevents defendants, as employers of labor, from making an agreement fixing the wages they will pay their employés for installing supplies. I think it clear that prior to the enactment of the statute of 1899 courts had no authority, at the instance of a representative of the people, to enjoin the making of such agreements. See *Beck* v. *Protective Union,* 118 Mich. 516, 517 (42 L. R. A. 407). They have now, then, no such authority unless such agreements are forbidden by that statute. If that statute forbids such agreements, it follows that it 'forbids all agreements fixing and regulating the price of labor, and that associations, whether of employés or employers, when endeavoring to fix and regulate the price of labor, are engaged in a criminal undertaking. Does that statute forbid such agreements ? In general, it may be said that the statute forbids certain contracts and certain defined trusts. An agreement fixing and regulating the price of labor is not one of these contracts, nor one of these trusts. See *Cleland* v. *Anderson,* 66 Neb. 258. If it may be said that an agreement fixing the price of labor violates the statute when it forms part of an undertaking which the statute forbids, it must also be said that it does not violate the statute unless it does form part of some undertaking forbidden by the statute. As defendants are, by the provision under consideration, enjoined from fixing or regulating the price of labor when it does not form a part of an undertaking forbidden by the statute, they are entitled to have that provision eliminated from the decree.

This suit is brought " by Ormond F. Hunt, prosecuting attorney in and for the county of Wayne, State of Michigan, who sues for the people of the State of Michigan." Defendants insist that the prosecuting attorney has no right to maintain this suit. They insist that he had no

such right before the statute of 1899 was enacted, and that section 2 of that act gives him such right only in cases where the law is violated by some association incorporated under the laws of this State. If we assume that defendants are right in this contention, it by no means follows that the decree should be reversed. The real complainant in this case is the people of the State of Michigan. The prosecuting attorney of Wayne county is merely the representative of the people. Except in form, this is a suit by the people of the State of Michigan, by Ormond F. Hunt, their attorney. The complaint, then, of defendants is this: That the prosecuting attorney who instituted this suit did not have authority or did not prove his authority to institute it. Had this objection been made in the lower court, it may be assumed that it would have been obviated either by an amendment or by an exhibition of proof of authority. No such objection was made until the case was heard in this court. It may therefore be said that, as the objection is only a *formal* one, raised for the first time in this court, it should be disregarded. *Wright* v. *Wright*, 37 Mich. 55.

The decree appealed from will be modified as heretofore indicated, and, as so modified, it will be affirmed.

MOORE, C. J., and MCALVAY, GRANT, and HOOKER, JJ., concurred.