BIGELOW v. CALUMET & HECLA MINING CO. et al.

(Circuit Court, W. D. Michigan, N. D. April 12, 1907.)

1. MONOPOLIES—CONTROL OF COMPETING CORPORATION.

The control by one mining corporation organized under the laws of Michigan of another similar corporation engaged in a competing business in interstate and foreign commerce by acquiring a majority of its stock, or in part by acquiring stock and in part by soliciting and obtaining proxies from other stockholders with the purpose and intention of eliminating competition and obtaining a monopoly of trade in their products, either complete or partial, is in violation of the federal anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), which makes unlawful every combination in restraint of interstate or foreign trade and commerce, and also of Pub. Acts Mich. 1899, p. 409, No. 255, as supplemented by Pub. Acts Mich. 1905, p. 507, No. 329, prohibiting all combinations entered into for the purpose and with the intent of establishing and maintaining a monopoly; nor is such transaction relieved from its invalidity under the latter statute by Pub. Acts Mich. 1905, pp. 153, 154, No. 105, which authorizes mining corporations of the state to purchase and own stock in other similar corporations.

2. SAME—FEDERAL ANTI-TRUST STATUTE—SUIT FOR INJUNCTION.

A private party, who has sustained special injury by a violation of the federal anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), may sue in a federal court for injunction under the general equity jurisdiction of the court, where, by reason of diversity of citizenship of the parties, the court has jurisdiction of the suit.

3. CORPORATIONS—SUIT BY STOCKHOLDER—CONDITIONS PRECEDENT.

A stockholder of a corporation may sue in a federal court to restrain another corporation which has obtained control of a majority of its stock from voting the same for the purpose of electing its own directors and eliminating competition between the two companies in alleged violation of law and to the irreparable injury of complainant as a stockholder, although the bill does not show a formal demand upon the directors to bring the suit as provided by equity rule 94, even conceding that the right of action is in fact that of the corporation, where the allegations prima facie negative collusion and fairly show that such demand would have been unavailing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 791-795.]

4. INJUNCTION—SPECIAL INJURY TO COMPLAINANT.

A bill by a stockholder of a corporation, who is also an officer and director to enjoin the voting of stock by another corporation for the alleged purpose of changing the management in its own interest and creating an illegal monopoly to the detriment of the minority stockholders, shows such a special interest in complainant as distinct from the public and such threatened irreparable injury to his rights as to justify the granting of a preliminary injunction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 305, 306.]

5. SAME—PRELIMINARY INJUNCTION—GROUNDS.

The bill of a stockholder and supporting affidavits *held* to make a showing which entitled him to a preliminary injunction to restrain defendant from voting stock to change the officers and management of the corporation pending a hearing on the merits.

In Equity. On application for preliminary injunction.

Angell, Boynton, McMillan & Bodman and Taggart, Denison & Wilson, for complainant.

Otto Kirchner, Chadbourne & Rees, and Butterfield & Keeney, for defendant Calumet & Hecla Mining Company.

KNAPPEN, District Judge. The complainant is a citizen of Massachusetts. The defendants, hereafter called, respectively, the Calumet & Hecla Company and the Osceola Company, are corporations organized under the Michigan mining law, and engaged in the manufacture and sale of copper. The complainant, who is the president of, and a substantial stockholder in, the Osceola Company, filed his bill on the 12th day of March, 1907, for the purpose of obtaining injunction, both temporary and permanent, restraining the Calument & Hecla Company from voting at the annual stockholders' meeting of the Osceola Company (then appointed to be held on March 14, 1907) a large block of Osceola Company stock held by the Calumet & Hecla Company, as well as proxies for a large amount of other of such stock held by that company, upon the ground that the action of the Calumet & Hecla Company in buying and obtaining proxies for such stock constitutes an attempt to establish and maintain a monopoly of the business of mining, smelting, refining, and selling copper, contrary to the Sherman anti-trust act, the Michigan anti-monopoly law, and common-law obligations. Upon the filing of the bill, an order was issued restraining the voting of such stock in advance of the hearing of the application for temporary injunction, except to the extent of adjourning the annual meeting. Hearing upon the application for temporary injunction has been had upon the bill, answer, and testimony by way of ex parte affidavits filed on both sides.

The Calument & Hecla Company was organized in 1871, and capitalized at $2,500,000, only $1,200,000 of which has been paid in. Its operation has been highly profitable; the market value of its stock being now about $90,000,000. The Osceola Company is capitalized at $2,403,750. It likewise has been profitably operated, having for the past 20 years (except in 1903) paid dividends without interruption; those paid in 1906 aggregating 64 per cent. of the par value of the stock, whose market value is now nearly six times the par value. The two mining companies are in active competition with each other in the production and sale of copper throughout the United States and foreign countries; the mining operations of both being carried on in the upper peninsula of Michigan.

Until 1905, companies organized under the Michigan mining law had no power to own stock in other mining companies in this state, although for many years they had been authorized to own stock in companies outside the state. 2 Comp. Laws Mich. 1897, § 7012. In 1903, mining companies were given authority to hold stock in companies formed under the Michigan mining law or under any other laws for refining, smelting, or manufacturing ores, minerals, or metals. Pub. Acts Mich. 1903, pp. 382, 383, No. 233. In 1905, corporations organized under the Michigan mining law were empowered to "subscribe for, purchase, own and dispose of stock in any company organized under this act, or under any other laws, foreign or domestic, for the purpose of mining, refining, smelting or manufacturing any or all kinds of ores or minerals." Pub. Acts Mich. 1905, No. 105, pp. 153, 154.

The testimony tends to show that Michigan copper, which is known commercially as "lake copper," is of a different quality from that produced elsewhere in the United States, having superior tensile and tor-

sional strength, ductility, and conductivity, usually bringing in the market a slightly higher price than other copper; that the best grade of lake copper, called in the bill "prime lake copper," has thus far been produced only by five companies, in the following amounts annually, Calumet & Hecla 100,000,000 pounds, Osceola 18,000,000, Quincy 18,000,-000, Tamarack 10,000,000, and Wolverine 10,000,000; the Calumet & Hecla Company thus producing over 75 per cent. of the aggregate— defendants' testimony tending to show that at least five other Michigan mines are producing copper, aggregating over 11,000,000 pounds annually, which rightly treated would be equally good. It is undisputed that for certain purposes lake copper is preferable to any other copper, and the testimony tends to show that the United States government, in its purchases of unmixed copper for the manufacture of cartridge cases, buys only lake copper, and thus far has specified only Calumet & Hecla, Osceola, Quincy, and Tamarack. It is undisputed that of the 1,000,000,000 pounds of copper produced annually in the United States (which is considerably more than produced in all other countries) lake copper constitutes one-quarter or one-fifth, about one-half of which amount is produced by the Calumet & Hecla Company. The testimony tends further to show that since the 1905 amendment to the Michigan mining law the Calumet & Hecla Company has embarked upon a pronounced policy of expansion; that it has expended from $2,000,000 to $3,000,000 in exploring mines on lands of other companies, and several million dollars in the purchase of stocks in competing mining companies, and that it has taken options on stocks of other mining companies. The companies in which such interests have lately been acquired include the Centennial, Allouez, La Salle, Gratiot, Manitou, Frontenac, Superior, and others, some of which mines are now competitive and productive, others of which are still in the exploratory stage; the Calumet & Hecla Company owning in most of these companies a majority interest, and in one or more cases the entire. As a part of this policy of expansion, the Calumet & Hecla Company has increased its own land holdings from about 2,700 acres to about 50,000 acres; the land holdings of the companies in which interests have been acquired bringing the aggregate holdings of land to above 70,000 acres. The testimony further tends to show that within a few months before the date fixed for the 1907 annual meeting of the Osceola Company the Calumet & Hecla Company quietly bought up a large amount of Osceola stock; the management of the Osceola Company knowing nothing of such purchase until February 20th (22 days before the proposed annual meeting), on which date 20,000 shares were transferred to the Calumet & Hecla Company on the books of the Osceola Company, and the Calumet & Hecla Company also being the owner of additional holdings not of record, the amount of which is not shown, except that the answer of the defendant says that its holdings are less than a majority, which majority would be about 48,000 shares. On February 21, 1907, the Calumet & Hecla Company sent, in its own name, to all the stockholders of the Osceola Company whose names and addresses it could learn, a circular letter in which the Calumet & Hecla Company, "as the largest stockholder of the Osceola Consolidated Mining Company," asked that all Osceola stockholders who should be willing to

intrust the management of the company to a board of directors "the majority of whom should be selected" from a list given in the letter (who in fact were representatives of the Calumet & Hecla Company) appoint as their proxies three Calumet & Hecla representatives named therein, one of whom is the vice president of that company. The testimony tends to show that on the same 21st day of February the Calumet & Hecla Company wrote to complainant, as president of the Osceola Company, a letter stating that the Calumet & Hecla Company had become the largest shareholder of record in the Osceola Company, and expected to "elect a majority of the directors at its annual meeting, March 14th, next," and requesting that until such election no contract be entered into by the president, directors, or agents of the Osceola Company which by its terms was not to be performed entirely during the term of the present board of directors (which would naturally then extend but a few weeks longer), especially contracts for the sale of its copper product or for the purchase of coal, contracts with railways and mills, for the sale of lands or for the location of mills. The manifest purpose of the Calumet & Hecla Company in sending this letter was to prevent the Osceola Company from entering into any contracts, or assuming any obligations, which could conflict with the management of the Osceola Company by the Calumet & Hecla Company in case the latter should secure such expected control. The case presented fairly tends to show that the Calumet & Hecla Company bought its holdings of Osceola stock, and procured the proxies referred to, with the intention, if possible, of thereby controlling the management of this competing company, with which it had previously no connection by way of stock ownership or otherwise, and of turning out the present management of the Osceola Company; that it would have bought a controlling interest had such interest been readily acquirable on satisfactory terms; and that it has obtained enough proxies, together with its own stock holdings, to elect a controlling majority of the board of directors of the Osceola Company, and at the time the bill was filed was intending to so vote such shares and to so act.

The Kearsarge lode runs through the mines of the Calumet & Hecla, Osceola, Centennial, Allouez, La Salle, and Gratiot. The testimony tends to show that the Calumet & Hecla Company proposes by combining the Osceola with its other holdings to operate that company, the Calumet & Hecla, Centennial, Allouez, and possibly other mines, by sinking through Osceola lands shafts for other mines, shafts for the Osceola through the lands of other companies, and using for some or all of these mines on the lode drifts or openings from the lands of other mines, using machinery in common to some extent for two or more of such mines, including the Osceola, and having ores from all these mines stamped, smelted, refined, and sold through Calumet & Hecla agencies; that the Osceola's product is now, and for a long time has been, sold through the United Metals Selling Company, with which the Calumet & Hecla is not in sympathy; that the Osceola, in connection with two other mines, owns a smelter and is interested in a chemical company, the use of both of which the Calumet & Hecla Company proposes to dispense with. Complainant's affidavits tend to show that such proposed change of policy and management, in-

cluding such proposed interuse of shafts, drifts, and machinery, would be injurious to the interests of the Osceola and its stockholders, through the increased danger of fire, peril to life, and otherwise; that the management of the Calumet & Hecla Company has been, and is, extravagant, and it is only by reason of the phenomenal richness of its ores that its management has been profitable; that the alleged extravagant management of the Calumet & Hecla Company applied to the Osceola ores would render the operation of the latter company unprofitable, would depress stock values, and would greatly injure complainant and other minority stockholders in the Osceola Company. Complainant's testimony further tends to show that the control of the copper output of the mines of Michigan would establish an absolute and complete monopoly in the production of the best grades of copper, independently of the ownership of any mines now in operation within the United States or elsewhere, and would permit the raising of the price of such copper; that the control of the Calumet & Hecla and the Osceola mines by one corporation will tend to create a practical monopoly in the supply of such copper so used and would eliminate all competitive bidding as between the two companies, thus creating a monopoly in the supply of such copper; that such control of the Osceola Company by the Calumet & Hecla Company would result in at least a partial monopoly in prime lake copper; that the acquisition of the Tamarack and Quincy mines would make such monopoly complete; and that the effect of the control of the Osceola Company by the Calumet & Hecla Company would of itself enable the latter to raise the price of prime lake copper.

The bill alleges that lake copper is used in all branches of the arts in enormous quantities, and is used and sold outside the state of Michigan, being delivered by the companies producing it to all parts of this and foreign countries; that the Osceola Company is in active competition with the Calumet & Hecla Company in producing and selling such copper throughout the United States and in foreign countries; that each of said companies is engaged in interstate and foreign commerce; that the action of the Calumet & Hecla Company in so attempting to secure control of the Osceola Company, including the election of its board of directors, is a part of the general plan of the Calumet & Hecla Company to secure control of practically the entire output of lake copper, and thereby secure a complete and absolute monopoly of the product of such copper throughout the United States, and especially of such prime lake copper; and that such purchase of stock and procurement of proxies are ultra vires and confer no authority upon the Calumet & Hecla Company to vote the same.

The defendant, both by answer and affidavits, disputes many of complainant's allegations of fact, expressly denying that it is intending or attempting to obtain a monopoly or control either of prime lake copper or of lake copper generally, and denying that its control of the Osceola Company would or could accomplish such monopoly, complete or partial. It disclaims any intention to operate the Osceola Company to the injury of the minority stockholders; alleges that the majority of the stockholders of that company are dissatisfied with the present management, and that it intends to make the operation

of the Osceola Company's property more profitable to the latter's stockholders than heretofore. It submits that the acts complained of do not offend against either the federal anti-trust act, the Michigan anti-monopoly act, or common-law equity principles; that if the acts complained of are unlawful the remedy by injunction may be invoked only by the Attorney General of the United States, or the Attorney General or prosecuting attorneys of the state of Michigan; that, if such injunctive relief may be given to a private party, it can be given only to the Osceola Company; that complainant, as a minority stockholder, has shown no right to act on behalf of the corporation; that no peculiar injury to complainant, actual or threatened, is alleged; and that, upon the face of the testimony presented, an injunction in advance of final hearing would be an unwarranted divesting of property rights and an unwarranted disturbing of the existing status.

1. The bill plainly alleges a violation of law, unless the transaction complained of is made lawful by the fact that the alleged attempted monopoly is proposed to be accomplished by means of a control of stock in a competing company, rather than by direct previous agreement between the two companies. The allegation is, in substance, that the stock has been purchased, and the proxies obtained, for the purpose of suppressing competition between two otherwise competing companies, and that the proposed control will in fact enable the creation of a monopoly. The formation of a monopoly for the purpose of suppressing trade or commerce is unlawful, both at common law (Richardson v. Buhl, 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457; Hunt v. Riverside Co-operative Club, 140 Mich. 548, 104 N. W. 40, 112 Am. St. Rep. 420; Chesapeake & Ohio Fuel Co. v. U. S., 115 Fed. 610, 53 C. C. A. 256), and under both the federal and state anti-trust laws. The federal act provides that every combination in restraint of trade or commerce is illegal. Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]. As said by Judge (now Justice) Day, in Chesapeake & Ohio Fuel Co. v. U. S., 115 Fed. 619, 53 C. C. A. 265: "All contracts and combinations are declared illegal if in restraint of trade or commerce among the states." Under the Michigan statute, a trust is a "combination of capital, skill or arts by two or more persons, firms, partnerships, corporations or associations of persons, * * * (3) to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity," and it is declared to be unlawful, against public policy, and void for two or more persons or corporations to "pool, combine, or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected." Pub. Acts Mich. 1899, p. 409, No. 255. The supplementary and declaratory act of 1905 provides that:

"All combinations of persons, partnerships or corporations made or entered into for the purpose and with the intent of establishing and maintaining, or of attempting to establish or maintain, a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy, illegal and void." Pub. Acts Mich. 1905, p. 507, No. 329.

It is not necessary under either the federal or state statutes that a complete monopoly be effected. It is sufficient if it tends to that end, and to deprive the public of the advantages which flow from free competition. U. S. v. E. C. Knight Co., 156 U. S. 16, 15 Sup. Ct. 249, 39 L. Ed. 325; Northern Securities Co. v. U. S., 193 U. S. 332, 24 Sup. Ct. 436, 48 L. Ed. 679; Hunt v. Riverside Co-operative Club, 140 Mich. 547, 104 N. W. 40, 112 Am. St. Rep. 420. The above-quoted language of both the federal and state statutes is in terms broad enough to cover any means purposely adopted for, and manifestly adapted to, the accomplishment of the unlawful purposes. It seems clear that, under the decision in Northern Securities Co. v. U. S., 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the creation of a monopoly by way of stock purchase and control offends against the statute. In that case, at page 331 of 193 U. S., and page 454 of 24 Sup. Ct. [48 L. Ed. 679], it is said:

"It (the Sherman anti-trust act) does embrace and declare to be illegal every contract, combination, or conspiracy, in whatever form, of whatever nature, and whoever may be the parties to it, which directly or necessarily operates in restraint of trade or commerce among the several states, or with foreign nations."

The distinction recognized in Davis v. A. Booth & Co., 131 Fed. 31, 65 C. C. A. 269, and in Northern Securities Co. v. U. S., between cases of outright purchase of the entire property of the absorbed company, and cases of combination of owners and property under one management, where each owner's interest is continued in the combination, would seem to place a combination by way of stock purchase and stock proxies within the prohibition of the statute. In the late case of Dunbar v. American Tel. & Tel. Co., 79 N. E. 427, 224 Ill. 9, the Supreme Court of Illinois has directly held that, where a corporation purchased the majority of the stock of another corporation, it is sufficient to condemn the transaction as unlawful, if its tendency is to restrain competition. This principle is impliedly recognized in Clark & Marshall on Private Corporations, § 652 (14). Nor can the fact that the alleged monopoly is proposed to be effected in part by the holding of proxies relieve an otherwise unlawful transaction of its unlawful character. If the object of obtaining the proxies was, as alleged, to create a monopoly, it is within the manifest prohibition of the law. The identity of the two corporations is maintained, and the combination is as effective as if a lease of the corporate property had been given.

The fact that the Michigan mining statute of 1905 gave the Calumet & Hecla Company power to purchase and own stocks in other mining corporations is invoked as making lawful the monopolistic control obtained through such purchase. The proposition is, in other words, that the Michigan statute gives the right to do the act complained of. Pub. Acts Mich. 1905, p. 153, No. 105. But this statute must be read in connection with the avowed policy of the state as expressed by its statutes. Distilling & Cattle Feeding Co. v. People, 156 Ill. 491, 41 N. E. 188, 47 Am. St. Rep. 200. When the amendment above referred to was passed, the statute of 1899, above referred to, was in force. The same Legislature which passed the mining amendment of 1905

later passed Act No. 329, p. 508, Acts 1905, "supplementary to, and declaratory of," the anti-monopoly act of 1899, containing the express provision before quoted, and in addition thereto exceptionally drastic provisions designed to prevent monopolies, total or partial, by whatever means accomplished. The result of these two statutes is that power was given to the Calumet & Hecla Company to purchase stock in the Osceola Company, but the right to exercise that power in violation of the anti-monopoly statutes of the state was not given. For the reasons stated, the conclusion reached is that the bill sufficiently alleges an unlawful combination.

2. The question whether a bill for injunctive relief can be maintained under the federal anti-trust act at the instance of a private party is not free from difficulty. It is strenuously contended that under neither the federal anti-trust act nor the state act can relief by way of injunction be granted to a private party; that section 4 of the federal act, which provides for injunctive relief, is expressly limited to suits brought at the instance of the Attorney General; and that section 7 of the federal act, giving to an injured party a right of action at law for treble damages, considered in connection with section 4 referred to, by necessary implication excludes the right of a private party to maintain any suit except that for treble damages under section 7, regardless of the general equitable jurisdiction of the court. Some of the cases cited affirm this contention. Others of them, in my judgment, do not, but, on the contrary, recognize the rule that the prohibition against injunctive relief under the federal act is limited to suits brought for injuries common to the general public, and that under the general jurisdiction of equity relief may be granted to a private party against violations of the anti-trust act.

In Blindell v. Hagan (C. C.) 54 Fed. 40, and Id., 56 Fed. 696, 6 C. C. A. 86, relief was asked, first, under the federal anti-trust act; and, second, under the general equity jurisdiction of the court. The district judge held that no one but the Attorney General could file a bill under the anti-trust act, but that, as the court had jurisdiction of the case by reason of diverse citizenship of the parties, it could grant relief upon the grounds of inadequacy of legal remedy and the prevention of multiplicity of suits. The relief granted was given none the less on account of the unlawful combination in restraint of trade.

In Pidcock v. Harrington (C. C.) 64 Fed. 821, complainant expressly disclaimed any right to relief under the general equity principles of the common law, and planted himself solely on the Sherman act. The district judge sustained a demurrer to the bill. The decision was not reviewed. It does not appear that there was diverse citizenship of the parties, and thus that the court would have had jurisdiction of the case but for the federal question.

In Gulf, C. & S. F. Ry. Co. v. Miami S. S. Co., 86 Fed. 407, 30 C. C. A. 142, it was held that no case was stated under either the federal anti-trust act or the common law; but it was said:

"We do not doubt the general jurisdiction of the Circuit Court as a court of equity to afford preventive relief, in a proper case, against threatened injury about to result to an individual, for any unlawful agreement, combination or conspiracy in restraint of trade."

In So. Ind. Exp. Co. v. U. S. Exp. Co. (C. C.) 88 Fed. 659, and Id., 92 Fed. 1022, 35 C. C. A. 172, heard on demurrer to bill, the acts com-plained of were entirely lawful unless by reason of the federal anti-trust act. It was held that under that law a private party could not obtain relief by bill in equity. It does not appear that the court had jurisdiction by reason of diverse citizenship.

In Metcalf v. American School Furn. Co. (C. C.) 108 Fed. 909, and Id., 113 Fed. 1020, 51 C. C. A. 599, heard on motion for temporary injunction and on demurrer to the bill, complainant sought, first, relief against the monopoly created by the absorption of the Buffalo Company by the American School Furniture Company, and, second, the assessment and collection in the equity suit of the treble damages given by the seventh section of the federal anti-trust act. The district judge held that these damages were recoverable only in an action at law for the sole benefit of the complainant, while the equitable relief was for the benefit of all interested in the corporation, and that the bill was thus multifarious. The right to equitable relief was not, however, denied, but expressly affirmed. After the bill had been amended by eliminating the demand for treble damages, and upon hearing upon demurrers and pleas to the amended bill ([C. C.] 122 Fed. 115), the district judge held that the bill presented no case except under the federal anti-trust law, and that under that law suit for injunctive relief could be brought only at the instance of the Attorney General. This decision has not been reviewed.

While the decisions referred to are entitled to great respect, they do not commend themselves to my judgment so far as they deny the right of a private party, who has sustained special injury by the violation of the anti-trust act, to relief by injunction under the general equity jurisdiction of the court. As already seen, the cases referred to do not generally announce such rule.

The case of Minnesota v. Northern Securities Co., 194 U. S. 48, 70, 72, 24 Sup. Ct. 598, 48 L. Ed. 870, does not, to my mind, assert the rule contended for by defendant. On the contrary, it seems to recognize by implication a contrary rule. In that case, which was decided since the decisions in all the cases referred to above, the state sought relief under both the Minnesota statute and the federal anti-trust act. It was held that relief could not be given under the Minnesota statute for lack of diverse citizenship of the parties, nor under the federal statute because the injury alleged to have been sustained by the state was not direct or special, but only "remote and indirect; such an injury as would come alike, although in different degrees, to every individual owner of property in a state by reason of the suppression, in violation of the act of Congress, of free competition between interstate carriers engaged in business in such state; not such a direct, actual injury as that provided for in the seventh section of the statute." It was accordingly merely held (so far as right to relief under the federal anti-trust act is concerned) that the intention of the statute was "to limit direct proceedings in equity to prevent and restrain such violations of the anti-trust act as cause injury to the general public, or to all alike, merely from the suppression of competition in trade and commerce among the several states and with foreign nations, to those in-

stituted in the name of the United States under the fourth section of the act, by district attorneys of the United States, acting under the direction of the Attorney General."

I cannot overlook the fact that the federal anti-trust act is highly remedial. Its apparent object is not to restrict, but to extend, remedies. The seventh section gives the Circuit Courts jurisdiction without respect to the amount in controversy, allows threefold damages and the costs of suit, including a reasonable attorney's fee. The very penal provisions invoked by defendant's counsel as requiring a strict construction of the act are but evidence of the highly remedial nature of the statute, and I am loath to conclude that a statute of this nature should be construed as taking away the otherwise existing jurisdiction of equity to afford relief. In this case jurisdiction is conferred by the diverse citizenship of the parties.

The case of In re Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110, is not without pertinency. It was there held (under habeas corpus proceedings alleging lack of jurisdiction) that a bill in equity was properly filed by one railroad company against other railroad companies under the interstate commerce act of February 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], to restrain the refusal to afford equal facilities to the connecting line, as exhibiting a case arising under the laws of the United States, namely, the interstate commerce act. The court there said (page 554 of 166 U. S. and page 660 of 17 Sup. Ct. [41 L. Ed. 1110]):

"Cases arising under the laws of the United States are such as grow out of the legislation of Congress, whether they constitute the right or privilege, or claim, or protection, or defense of the party, in whole or in part, by whom they are asserted."

It is noticeable that the act there in question expressly provided for relief to the injured person either by suit against the offending carrier or through complaint to the commission (sections 8 and 9), but not for injunction, except under circumstances not existing, and by methods not employed in the suit in question.

The bill alleges that the complainant's remedy at law is inadequate, and it may well be. It is fairly inferable from the case presented that, if the control of the Osceola Company by the Calumet & Hecla Company is had, a complete revolution in the management and in the method of operation of the former company will take place. To prove damages as resulting from such a combination, in view of the complete change of methods intended, and under an entirely new management, may well be difficult. The reasons for such difficulty seem too apparent to require elaboration. The Michigan statute, however (Pub. Acts Mich. 1899, p. 409, No. 255), contains no express provision for injunction suits by the district attorney or prosecuting attorneys, although "for a violation of any of the provisions of the act" it authorizes the institution of "proper suits or quo warranto proceedings in a court of competent jurisdiction," which is recognized as giving authority to maintain injunction suits to restrain violations of the anti-trust law. Hunt v. Riverside Co-operative Club, supra. It is therefore not necessarily subject to the same considerations as the federal statute.

In my opinion, under the case here presented, the objection that remedy by injunction cannot be afforded at the instance of the injured party should not be sustained.

3. It is contended that under the case made by the bill the grievance complained of is that of the Osceola Company, and that complainant, as a stockholder in that company, has not complied with general equity rule No. 94, adopted to prevent a collusive conferring of jurisdiction. The authorities agree that, where the relief is sought for the benefit of the corporation, the complaining stockholder must show that he has exhausted all means within his reach to induce the corporation to take action, to the extent of formally making demand for action upon the board of directors (and, as held in some cases, even upon the stockholders), unless it appears that such demand would be an idle ceremony. It is clear that such demand upon the stockholders would have been, in this case, an idle ceremony, as a majority of the stock is apparently controlled by the Calumet & Hecla Company. Moreover, but 22 days intervened between February 20th and March 14th, and the mining law required four weeks' publication of notice for special stockholders' meeting. 2 Comp. Laws Mich. 1897, § 6999. The bill alleges that the suit is not collusive; that complainant had consulted with a majority of the directors, all of whom expressed their opinion that the corporation should not bring the suit, in view of the antagonism thereto on the part of the majority of the stockholders, and in view of the near expiration of their terms as directors. Assuming that the relief asked for belongs to the corporation, the question is: Does the bill show that demand upon the directors to bring the suit would be an idle ceremony? This hearing is not upon demurrer to the bill, but upon answer and affidavits. There is force in the suggestion that the directors might properly be adverse to taking corporate action under the circumstances stated, and that under the allegations referred to there is as much ground for an inference that the board, if formally called together, would have declined to take corporate action, as in a case where individual directors are known to favor the situation complained of. The allegations prima facie negative collusion. If upon final hearing the jurisdiction of this court should be found to rest upon collusion, the bill would be then dismissed. The fact that the original bill did not allege compliance with rule 94 is not material. The amended bill was filed as a matter of right. On this hearing relief can be given on the amended bill with the same effect as if it were an original bill.

It is not clear, however, that the grievance complained of belongs solely to the corporation. An action at law for the recovery of damages on account of the acts sought to be enjoined would accrue to individual stockholders, under section 7 of the federal act and the eleventh section of the Michigan statute. Metcalf v. American School Furn. Co. (C. C.) 108 Fed. 909, 912; s. c. (C. C.) 122 Fed. 115, 116. The right of the complainant to maintain the bill for his personal interest is recognized by respectable authorities. High on Injunctions (4th Ed.) § 1227, and cases cited; Dunbar v. American Tel. & Tel. Co., 79 N. E. 423, 224 Ill. 9. If the Osceola Company was not a necessary party, and the bill is maintainable upon general equity princi-

ples, this court would have jurisdiction through diversity of citizenship, and thus the case would not be within the mischief aimed at by the rule in question.

4. It is contended that the bill does not allege a threatened, direct injury to complainant from the proposed monopoly charged, beyond such injury as would be suffered by the general public, and that irreparable injury is not sufficiently alleged to justify injunction. The seventeenth paragraph of the bill alleges that if the Calumet & Hecla Company shall secure the intended control of the Osceola Company it will be able to, and will, control the Osceola Company in its own interests, and not in the interests of complainant and other stockholders similarly situated; that the officers of the Osceola Company will have no independence of action in the management of that company's affairs; and that thereby complainant and other stockholders will suffer great loss and damage. As before said, this hearing is not on demurrer to the bill. The paragraph in question must be construed in connection with the other paragraphs of the bill and the case presented upon this application. The bill alleges that the complainant is director and officer of the Osceola Company, and defendant's affidavits allege that he receives a substantial salary. It is alleged that the Calumet & Hecla Company proposes to oust the present directors, including the complainant, as a director and officer. Complainant's affidavits tend to show that the Calumet & Hecla Company proposes to revolutionize the method of operation of the Osceola mine, both in mining, manufacturing, and selling, and in the interuse of shafts, drifts, and openings, and that the proposed methods, if applied, will injure the value of complainant's stock. Surely injuries such as these are distinct from such as would be suffered by the general public through the creation of a monopoly, and are injurious not only to the corporation as an entity, but to the individual stockholders. Moreover, under the anti-trust laws, if an unlawful monopoly is created, the Osceola Company would be subject not only to fine, but to forfeiture of franchises, notwithstanding the monopoly is created by action of the stockholders rather than by corporate action. Clark & Marshall on Private Corporations, § 314 (R). These injuries likewise are distinct from those suffered by the general public. If the injuries referred to shall be suffered by complainant, they are properly termed irreparable. High on Injunctions (4th Ed.) § 1227, and cases cited.

5. It is urged that the case made by complainant's bill and affidavits is fully met by defendant's answer and affidavits; that it is clearly shown that no combination in restraint of trade is actually threatened, or is possible; that this suit is a mere attempt on the part of minority stockholders to maintain themselves in power; that complainant and his associates are shown to have abused their trusts; that the proposed action sought to be restrained is in the best interest of the Osceola Company and its stockholders; that the injunction should be denied for these reasons, and for the further reason that it would violate the fundamental rule which forbids the disturbing, by injunction, of vested rights and existing status. In this connection, the apparent fact that the Calumet & Hecla Company bought its Osceola stock not merely for investment, but for the purpose of intervening in the man-

agement of the affairs of a competing company, is worthy of consideration. The fact that the answer completely denies the equity of the bill does not require a refusal of the injunction, nor should the court upon this hearing, and from affidavits, determine litigated questions of fact. It may be that upon the final hearing it must be held that complainant's case is completely overthrown. It is apparent, however, that if complainant shall sustain, on final hearing, the case presented by his bill, he is entitled to relief, unless it shall be found that the right belongs to some one other than complainant. The court is not to be understood as expressing an opinion upon the merits. It is sufficient for the purposes of this hearing that the court be convinced that upon the pleadings and upon the evidence a case is presented which makes the transaction a proper subject of investigation in a court of equity; or, otherwise stated, that complainant has a fair question to raise as to the existence of such right. It is in this view that the testimony favorable to complainant's case has been so fully set out. The court cannot say upon this application that complainant may not prevail upon final hearing, but is convinced that a fair question is raised as to the existence of the right asserted, and that opportunity should be given for a final decision upon the difficult questions of law and fact involved. Such being the case, the injunction should not be refused unless upon the balancing of convenience and inconvenience, to the one party or the other, an injunction appears inexpedient.

Upon such balancing, the considerations in favor of the injunction preponderate. If the injunction is not issued, the office of this suit is practically ended. On the other hand, if the injunction issues, the worst that can happen to the Calumet & Hecla Company is a continuance, until final hearing, of the present management, which, although unsatisfactory to the majority of the stockholders (including the Calumet & Hecla Company) is not shown to seriously jeopardize the interests of the Osceola Company and its stockholders. The rules and considerations applicable to conditions such as here presented are so fully stated in the recent case of Pere Marquette Ry. Co. v. Bradford (C. C.) 149 Fed. 492, as to make unnecessary further citation of authorities thereon. The consideration that complainant would have no right to appeal from an order refusing an injunction is properly entitled to weight. Harriman v. Northern Securities Co. (C. C.) 132 Fed. 464. Such injunction will not disturb the existing status, which is not, properly speaking, the abstract right of majority stock control, but rather the concrete fact of the present management of the Osceola Company as distinguished from a management by the Calumet & Hecla Company. The Osceola stockholders who have given their proxies to the Calumet & Hecla Company are not punished by the issuing of the contemplated injunction. No reason is suggested why their proxies given that company may not be revoked.

Upon these considerations, the issuing of temporary injunction in substantially the terms of the existing restraining order, which would operate to protect all interests concerned, seems both proper and expedient.

Temporary injunction will issue accordingly.