PEOPLES SAVINGS BANK *v.* STODDARD.

ATTORNEY GENERAL *v.* MICHIGAN NATIONAL BANK.

1. BANKS AND BANKING—INJUNCTION—PLAN FOR LIQUIDATION.

Record in chancery suit to enjoin defendant bank, its officers, and employees' profit sharing trust from acquiring plaintiff bank and its assets *held*, to justify finding of fact of existence of plan formulated by defendants to acquire 2/3 of the stock of plaintiff, that principal party in interest was defendant bank, that the purpose of the plan was to dissolve plaintiff bank for the economic benefit of defendant bank's branch in the same city, and that one of the individual defendants and the trust were used as agents of the defendant bank to accomplish the stock acquisition and liquidation of plaintiff.

REFERENCES FOR POINTS IN HEADNOTES

[3] 7 Am Jur, Banks § 287.
[4] 14 Am Jur, Courts § 46.
[5] 41 Am Jur, Pleading § 293.
[6] 7 Am Jur, Banks § 180.
Contract by national bank for purchase of stock in another corporation as *ultra vires*. 89 ALR 1308.
[8] 27 Am Jur, Income Taxes § 162.
Meaning of association or joint stock company within statutes taxing associations or joint stock companies as corporations ("Massachusetts" or business trusts). 108 ALR 340.
[10] 30 Am Jur, Internal Revenue § 65.
[11, 25] 7 Am Jur, Banks § 819.
[12] 7 Am Jur, Banks § 13.
[13] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 2.
[14, 15] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 93.
[16, 17] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 87.
[18] 50 Am Jur, Statutes § 538.
[20, 21, 22] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 120.
[23] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 130.
Applicability of State anti-trust act to interstate transaction. 24 ALR 787.

2. SAME—OATH OF DIRECTOR—VIOLATION OF STATUTE.

A plan for acquisition and control of plaintiff bank, which involved the execution of a false oath as a member of the board of directors by individual defendant, an agent of defendant bank, in that he was not an owner in good faith and in his own right, was in violation of statute (CL 1948, §§ 487.63, 487.64).

3. SAME—OATH OF DIRECTOR—FRAUD—VIOLATION OF STATUTE.

Plan for acquisition of plaintiff bank by defendant bank involving violation of director's oath by an individual defendant by masquerading as plaintiff's president to the bank, its directors and stockholders to whom he stood in a fiduciary relationship, while actually serving as agent of a competitor bank and seeking to destroy the institution he purported to serve, was in violation of statute (CL 1948, §§ 487.63, 487.64).

4. SAME—DISSOLUTION—PLEADING.

Fact that dissolution of plaintiff, a solvent and successful bank, formulated and executed by officers of competitor bank, was an attempt to circumvent the true application of the provisions of financial institutions act with respect to the *voluntary* liquidation and sale of assets is not relied upon as a basis for decision, where the issue was not pleaded, briefed, or argued at the hearing had in suit to enjoin effectuation of planned *voluntary* dissolution, and State banking commissioner has exclusive jurisdiction to institute all involuntary proceedings to dissolve a bank (CL 1948, §§ 487.99, 487.115–487.123).

---

[24] 14 Am Jur, Courts § 176.
    7 Am Jur, Banks § 821.
[25] 7 Am Jur, Banks § 819.
[26] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 162.
[27] 36 Am Jur, Monopolies, Combinations and Restraints of Trade § 93.
[28] 11 Am Jur, Conspiracy § 3.
[29] 28 Am Jur, Injunctions § 71.
[30] 44 Am Jur, Quo Warranto § 19.
    Quo warranto as a remedy for violation of criminal or penal statute by corporation. 53 ALR 1038.
[31] 54 Am Jur, United States Courts § 49.
    What actions against national commercial banks are within exclusive jurisdiction of federal courts. 14 ALR2d 1042.
[32] 11 Am Jur, Conspiracy § 56.
[33, 34, 36] 11 Am Jur, Conspiracy § 57.
[35] 11 Am Jur, Conspiracy § 47.
[37] 13 Am Jur, Corporations § 700.
[38] 28 Am Jur, Injunctions § 299.
[39] 44 Am Jur, Quo Warranto § 122.

5. Pleading—Amendment—Discretion of Court.

The discretion given a circuit judge to permit amendment of pleadings is broad, but where the issue is one of substance the opposing party should be given an opportunity to answer, reopen proofs, and brief and argue the issue prior to decision (CL 1948, § 616.1; Court Rule No 25 [1945]).

6. Trusts—Ultra Vires—Use as Agent—Profits.

Use of employees' profit sharing trust, which had been created for employees of defendant national bank, as agent of the bank for the purchase and destruction of plaintiff, a competitor of one of the bank's branches, *held,* an *ultra vires* use of the trust as an instrument of the bank's economic policy, since it was a use for a purpose other than "the exclusive benefit of the eligible staff members," notwithstanding defendant bank officer's claim the trust was to receive a profit on the deal for participation therein.

7. Banks and Banking—National Bank Affiliates—Tax-Exempt Employee Pension Trust.

A tax-exempt employee pension trust for "the exclusive benefit of the eligible staff members" of defendant national bank was not an affiliate of such bank, as claimed, within the meaning of the term "affiliate," as defined in pertinent Federal statute providing it should "include any corporation, business trust, association, or other similar organization" (12 USC [1958 ed], § 221a[b]).

8. Trusts—Business Trusts—Taxation.

The business, or "Massachusetts" trust, represents the employment of the form of a common-law trust for the purpose of carrying on business enterprises and is generally taxable under the internal revenue code.

9. Same—Employee Pension Trust—Tax Exemption—National Bank—Affiliate.

An employee pension trust, established and specifically authorized by State law and designed to take advantage of tax exemption under the Federal internal revenue code, *held,* neither a national bank affiliate nor holding company under national banking act, nor organized or chartered under any Federal statute (12 USC [1958 ed], § 221a; 26 USC [1958 ed], § 401; CL 1948 and CLS 1956, § 555.301 *et seq.*).

10. Taxation—Federal Revenue Acts.

The Federal revenue acts designate what interests or rights created by State law shall be taxed (26 USC [1958 ed], § 401).

11. States—Statutes—Federal Laws—National Bank.

The State's attorney general is not prevented from enforcing a State statute against a national bank, located within the State, which sought to purchase, through agents, stock of plaintiff bank, a competitor of one of its branches, where pertinent Federal statutes prohibited national bank from purchasing the stock of any other corporation and State statute does not permit any other corporation to own bank stock under circumstances involved, there being no conflict between the State and Federal statutes (12 USC [1958 ed], § 24; CLS 1956, §§ 450.10, 450.94).

12. Banks and Banking—National Banks—State Statutes.

National banks are subject to State laws in respect to their affairs unless such laws interfere with the purposes of their creation, tend to interfere or destroy efficiency of the banks, or conflict with express powers given them by paramount law of the United States.

13. Monopolies—Antimonopoly Statutes—Elimination of Competition—Control of Prices.

A monopoly, against which antimonopoly statutes are directed, may be said to be the result of the practical elimination of effective business competition which thereby creates a power to control prices to the harm of the public (CL 1948, §§ 445.-701, 445.762).

14. Same—Elimination of Competition.

An agreement or scheme, the manifest object of which is to acquire control over a competitor through its capital stock for the purpose of extinguishing competition, is *per se* in violation of the antimonopoly laws (CL 1948, §§ 445.701, 445.762).

15. Same — Dissolution of · Competitor Bank — Violation of Statutes.

Plan whereby defendant bank, through defendant agents, was to acquire 2/3 of the stock of plaintiff bank in order to vote its dissolution and eliminate the only general banking competition of defendant bank's branch in the same city represented a *per se* violation of the State antimonopoly statute (CL 1948, §§ 445.701, 445.762).

16. Same—Banking—Exemptions from Antimonopoly Laws.

Banking is not generally exempt from the antimonopoly laws, is not specifically exempted in the State antimonopoly laws, and the State financial institutions act does not specifically exempt banking from the antimonopoly acts (CL 1948, § 445.-701 *et seq.*; § 487.1 *et seq.*).

17. Banks and Banking—Monopolies—Public Policy.

Argument that State policy, as evidenced by the financial institutions act, permits creation and maintenance of 1-bank cities, evidences a concern for the stability and economic soundness of the banks that is, in some situations, above the maintenance of free and unlimited competition, is not applicable where protection of public from imprudent banking and economic necessity does not justify elimination by other than a voluntary means of all but 1 bank in a city which has been supporting and could continue to support 2 banks (CL 1948, § 487.1 *et seq.*).

18. Statutes—Implied Repeals.

Repeals by implication are not favored.

19. Same—Repeals—Financial Institutions Act—Antimonopoly Law.

The State financial institutions act neither expressly nor impliedly exempted banking from the operation of the previously-enacted State antimonopoly laws (CL 1948, § 445.701 *et seq.*; § 487.1 *et seq.*).

20. Monopolies—Federal Statutes—State Courts.

The Federal antitrust laws do not so pre-empt the field of monopoly regulation as to deny State-court jurisdiction of suit by plaintiff bank to enjoin defendant national bank and its agents from eliminating plaintiff as a competitor to one of defendant bank's branches (26 Stat 209, as amended; 38 Stat 730, as amended; CL 1948, § 445.701 *et seq.*).

21. Same—Statutes—Common Law—Police Power.

Antimonopoly statutes, translating the common-law prohibition into statutory form, are an exercise of the police power of the State (CL 1948, § 445.701 *et seq.*).

22. Same—Statutes—States—United States.

The State antimonopoly statute parallels and augments the Federal antitrust acts, and does not conflict with them (26 Stat 209, as amended; 38 Stat 730, as amended; CL 1948, § 445.701 *et seq.*).

23. Same—State Enforcement.

States may enforce their own antimonopoly legislation, where the effect of the monopoly is primarily intrastate (CL 1948, § 445.701 *et seq.*).

24. Same—State Courts—Jurisdiction.

A State court has jurisdiction to enforce State antimonopoly statute against defendants, all of whom, except defendant

national bank which participated with them in a conspiracy to violate such State law, are residents of the State or institutions created under and governed by State law, hence, plainly subject thereto, where the victim of the monopoly was a State bank and the impact of the monopoly would be overwhelmingly local (CL 1948, § 445.701 *et seq.*).

25. STATES—INJUNCTION—NATIONAL BANKS—FEDERAL REGULATIONS.

A State injunction against a national bank from destroying a State bank by violation of State laws does not purport to interfere with Federal regulation of a Federal agency but merely requires that such Federal agency, as it operates within this State, must obey State laws passed under the State's police power which in no way conflict with applicable Federal policy.

26. BANKS AND BANKING—FEDERAL STATUTES—MONOPOLIES.

The Federal banking statutes do not include either permission for or restriction against monopoly practices in banking (12 USC [1958 ed], § 24).

27. SAME—ELIMINATION OF COMPETITION—VIOLATION OF STATUTE.

Plan whereby defendant national bank and its agents were to purchase 2/3 of the stock of plaintiff State bank, a sole competitor of one of the branches of defendant bank, and then vote to dissolve the plaintiff *held*, in violation of State law in both objective and means of execution (12 USC [1958 ed], § 24; CL 1948, § 445.701 *et seq.*; §§ 450.10, 450.94; § 487.1 *et seq.*).

28. CONSPIRACY—DESTRUCTION OF STATE BANK.

Circuit judge's finding that defendants' plan for acquisition and destruction of plaintiff State bank was an illegal conspiracy *held*, correct under record presented, there being a combination of 2 or more persons by concerted action to accomplish an unlawful purpose by unlawful means (12 USC [1958 ed], § 24; CL 1948, § 445.701 *et seq.*; §§ 450.10, 450.94; § 487.1 *et seq.*).

29. INJUNCTION—FORESTALLING DISSOLUTION OF STATE BANK—EVIDENCE.

Injunctive relief by way of forestalling dissolution of plaintiff State bank, as planned by defendants pursuant to an illegal conspiracy, *held*, justified under record presented.

30. QUO WARRANTO—DISSOLUTION OF STATE BANK—CONSPIRACY—EVIDENCE.

The attorney general in proceeding in quo warranto against

defendant national bank to forestall dissolution of State bank pursuant to illegal conspiracy between defendant national bank and its agents, whereby a sole competitor of one of the defendant bank's branches would have been eliminated in violation of statute, *held,* justified under record presented (CL 1948, § 445.701 *et seq.*; §§ 450.10, 450.94; § 487.1 *et seq.*; § 638.13, subds 2, 5).

31. COURTS—CHANCERY CASES—QUO WARRANTO—CONSTITUTIONAL LAW.

No substantial State or Federal constitutional question *held,* to have been presented for adjudication in either a chancery suit to enjoin dissolution of State bank whose liquidation was the aim of an illegal conspiracy by defendant competitor national bank or in quo warranto proceeding by attorney general against the defendant bank to forestall dissolution of the State bank (CL 1948, § 445.701 *et seq.*; §§ 450.10, 450.94; § 487.1 *et seq.*; § 638.13, subds 2, 5).

32. DAMAGES—EQUITY—BURDEN OF PROOF—ANNOUNCED DISSOLUTION OF BANK—LOSS OF DEPOSITS—PROXIMATE CAUSE.

Plaintiff State bank in suit to forestall its dissolution as result of illegal conspiracy by defendant national bank and its agents in order to eliminate plaintiff, the sole competitor of one of the branches of defendant bank, *held,* not to have met its burden of proof as to damages, not because of failure to prove certainty as to amount, but because it was not shown the decline of deposits was caused by the announcement of the contemplated dissolution, certain events having tended to mitigate the impact of the announcement.

33. BANKS AND BANKING—CONSPIRACY TO DISSOLVE BANK—DIVESTITURE OF STOCK—DISPOSITION OF PROCEEDS.

Order requiring defendants, participants in illegal conspiracy to dissolve plaintiff State bank, to divest themselves of the stock they had acquired in plaintiff, appointing a receiver to sell such stock at public sale to prevent completion of the scheme for destruction of plaintiff, is affirmed but modified to effect divestiture of all interest in and control of stock of plaintiff, and prohibiting any defendant from bidding at the public sale, proceeds of the sale being used to reimburse defendant purchaser thereof up to amount it had paid therefor, overage, if any, to be held by receiver for claimants in future proceedings.

34. CONSPIRACY—PROFITS—RETURN OF SALARY—DAMAGES.

Wrongdoer who was a participant in illegal conspiracy to dis-

solve plaintiff State bank *held*, not entitled to profit by his
action, being ordered to return salary received and pay amount
of damages to plaintiff caused by unnecessary audit expense.

35. INJUNCTION—DAMAGES—PARTIES.

Plaintiff State bank in suit to enjoin its dissolution which would
have resulted from illegal conspiracy to liquidate it *held*, not
entitled to award of fee paid by one of the defendants to
individual who had participated in the negotiations but was
not a member of the conspiracy and is not a party to the in-
junction suit.

36. CONSPIRACY—FEES.

Fees of member of conspiracy to dissolve plaintiff State bank
*held*, not recoverable, in suit to enjoin dissolution, by plaintiff
bank which had not furnished money for paying him such fees,
although regarded as recoverable by the supplier of the funds,
a tax-exempt employees' profit sharing trust.

37. INJUNCTION—SALE OF STOCK—DIVIDENDS.

Dividends on stock of plaintiff State bank presently held by
clerk of the court in which injunction suit is pending are
ordered paid to successful bidder at public sale of the stock.

38. COSTS—DISSOLUTION OF STATE BANK—DAMAGES—EXPERT WIT-
NESS FEES.

Costs in suit to enjoin dissolution of plaintiff State bank are
granted prevailing plaintiff except for fees of expert witnesses
on damages, such being sole issue upon which plaintiff did
not prevail, apportionment being ordered on remand.

39. SAME—PUBLIC QUESTION—QUO WARRANTO.

No costs are allowed in attorney general's quo warranto pro-
ceeding against defendant national bank and its agents in-
volved in an illegal conspiracy to dissolve a State bank, only
public questions being involved.

Appeal from St. Clair; Quinn (Timothy C.), J.,
presiding; and original quo warranto, with order of
reference to circuit court for hearing and determina-
tion. Submitted October 16, 1959. (Docket Nos. 37,
38, Calendar Nos. 47,277, 48,180.) Decided April 11,
1960. Rehearing denied June 7, 1960.

Bill by Peoples Savings Bank, a Michigan banking
corporation, against Howard J. Stoddard, Leonard

Zick, Michigan National Bank, a national banking association, Michigan National Bank Employees' Profit Sharing Trust, an association, and various individual bank and trust officers, to restrain monopoly of banking business in Port Huron, to enjoin voting of plaintiff bank's stock, for appointment of receiver to sell plaintiff bank's stock acquired by officials and trustees of defendant organizations, in order to forestall plan for sale of assets and dissolution of plaintiff bank, and for punitive damages and other incidental relief.  Attorney General intervened as party plaintiff.

Original quo warranto by the Attorney General in and for the people of the State of Michigan, against Michigan National Bank, Michigan National Bank Employees' Profit Sharing Trust, Howard J. Stoddard, Leonard O. Zick, and various individuals, for similar relief.

Cases consolidated for hearing.

Decree for plaintiff in chancery case, enjoining defendants from voting plaintiff bank's stock obtained by unlawful means, directing a public sale of plaintiff bank's stock in possession of defendants with right reserved to certain defendants to purchase, granting incidental damages but denying substantial and punitive damages.  Plaintiff and intervening plaintiff appeal.  Defendants cross appeal.  Modified, principally to provide against purchase by any of defendants of plaintiff bank's stock at public sale.

Judgment of divestiture in quo warranto proceedings, enforceable by similar injunction, receivership, and public sale of bank stock held by defendants.

*Covington, Davidson & Osborn,* for plaintiff Peoples Savings Bank.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Maurice M. Moule,* Assistant Attorney General, for intervenor and for plaintiff in quo warranto.

*Butzel, Eaman, Long, Gust & Kennedy* and *Walsh, O'Sullivan, Stommel & Sharp* (*Frank D. Eaman, Thomas G. Long, Rockwell T. Gust, Victor W. Klein, Kenneth J. Stommel* and *Harold A. Ruemenapp,* of counsel), for defendants Stoddard, Michigan National Bank, Michigan National Bank Employees' Profit Sharing Trust, and its officers and trustees.

*Peter E. Bradt,* for defendant Zick.

EDWARDS, J. We deal here with a story of high finance and less lofty subterfuge. By this latter means the defendant Michigan National Bank sought to accomplish indirectly that which State and Federal law prohibited it to do directly. It secured the purchase of 2/3 of the capital stock of the Peoples Savings Bank of Port Huron for the purpose of having that stock voted for dissolution. The net effect of the plan, if carried to completion, would be to leave Michigan National's Port Huron branch the only bank in Port Huron authorized to carry on a general banking business.

In seeking to accomplish this result, the defendants employed a pension trust fund established to provide pensions for Michigan National Bank's employees to make the stock purchase. The members of the executive committee of the board of directors of Michigan National Bank constituted the board of trustees of the trust which was pledged by its trust agreement not to use trust funds "for any

purpose whatsoever other than the exclusive benefit of the eligible staff members [of the Michigan National Bank] or their estates." These trustees authorized the purchase, by the trust, of Peoples Savings Bank stock admittedly for the purpose of dissolution of Peoples Savings Bank for the benefit of Michigan National's Port Huron branch.

Further, in pursuance of the plan described, defendants occasioned a businessman of good reputation to assume the presidency of the Peoples Savings Bank when he was not legally qualified to do so, on the false representation that he was in his own right the majority stockholder, and to violate the fiduciary obligations of his newly assumed office by seeking actively, though secretly, the destruction of the bank by purchasing the balance of the 2/3 of the stock necessary to vote dissolution.

The plan, the concealment, the purpose, and the result are all conceded on this record. The defense is that the plan, including its means of execution, was legal, that the concealment was good business, that the State law against monopoly is not applicable to banking, that monopoly in banking is consistent with Federal and State banking law, and that anyhow the Michigan National Bank and the employees' trust fund are a national bank and a national bank "affiliate," respectively, and hence State law, whether common or statutory, cannot interfere with their described actions because of Federal pre-emption of the field.

As we will make clear, we do not think this State and its courts are so powerless.

This opinion deals with 2 cases consolidated for hearing.

The first, Peoples Savings Bank *v.* Stoddard, is a chancery action, brought in the name of the bank by its directors (who owned 7% of the stock of Peoples Savings Bank of Port Huron), seeking injunc-

tive relief and damages against defendants on the grounds that defendants had by illegal conspiracy gained possession and control of the 2/3 majority of the stock required to vote dissolution, and actually were in process of dissolving Peoples Savings Bank. In this case, a motion to dismiss was previously granted, and, on appeal, the trial judge's dismissal was reversed and the case remanded for hearing. *Peoples Savings Bank* v. *Stoddard,* 351 Mich 342.

The second case, Attorney General *v.* Michigan National Bank, is an original proceeding in quo warranto before this Court, brought by the attorney general on behalf of the people of the State of Michigan, alleging the same illegal conspiracy and seeking the same injunctive relief.

Both actions presented the same allegations of facts and raised basically the same issues, except as to the claim for damages presented in the chancery action. The quo warranto petition was, therefore, referred by this Court to the circuit judge to whom the chancery action was assigned for consolidated hearing of both matters.

Defendants in both cases are (1) the Michigan National Bank, a large bank chartered under national bank laws, with a home office in Lansing and a branch in Port Huron; (2) the Michigan National Bank Employees' Profit Sharing Trust,* an employee pension trust established for the benefit of Michigan National's employees; (3) a group of individuals who are both directors and members of the executive committee of the bank and trustees of the trust fund; and (4) an individual, Leonard O. Zick, who executed the purchases of the Peoples Savings stock.

The circuit judge who heard both matters entered an extended finding of fact and opinion in both cases, along with a decree in the chancery matter and a ref-

---

* The trust agreement is entitled, "Michigan National Bank Profit Sharing Trust Agreement for Staff Members."

eree's report in the quo warranto action. He found as a legal proposition that the State antimonopoly statutes did not apply to banking. But he found that a conspiracy on the part of defendants to accomplish the liquidation of Peoples Savings Bank by illegal means had been established, namely, violation of the "voluntary" dissolution provision and the qualification of directors provision of the Michigan financial institutions act (CL 1948, §§ 487.99, 487.112 [Stat Ann 1957 Rev §§ 23.852, 23.865], and CL 1948, §§ 487-.63, 487.64 [Stat Ann 1957 Rev §§ 23.803, 23.804]). His decree, therefore, enjoined defendants from proceeding with the proposed dissolution, and ordered divestiture of the stock, which he held defendant trust fund had illegally acquired, by turning same over to a receiver for public sale. He found that plaintiff in the chancery case had proved no damages, but awarded to plaintiff both salary and fees acquired by defendant Zick. The decree, however, provided that defendant trust fund, once divested of the stock, could be a bidder at the public sale. His report, as referee in the quo warranto matter, contained the same findings of fact and conclusions of law as described in the chancery case.

All parties in the chancery case appeal. The important contentions of plaintiffs, Peoples Savings Bank and the attorney general, are that the State antimonopoly laws do apply to banking, and that defendant trust fund, on these facts, is not empowered to purchase, and should be restrained from bidding for, the Peoples Savings Bank stock at the public sale proposed. Defendants, on the other hand, urge Federal pre-emption and State court lack of jurisdiction. They contend that no violation of any Federal or State statute is shown on this record, hence, that the finding of illegal conspiracy is erroneous.

A review of the lengthy record compiled at trial convinces us that the findings of fact of the trial

judge are well supported by the weight of the evidence and we adopt them *in toto.* It should be noted that the findings were prepared in the chancery matter,* and, hence, the parties referred to are those in Peoples Savings Bank *v.* Stoddard:

"1. In the spring of 1956, Myron E. Ogden was president of plaintiff and he had been its president since it was established in the early 1930's as a result of reorganizing United Savings Bank. Ogden owned or represented the owners of 51% of the capital stock of plaintiff; he and those he represented desired to sell this stock and it was listed with Roberts for sale. Ogden advised the board of directors and officers of plaintiff of his desire to sell and of his dealings with Roberts. There were some negotiations between Ogden and the directors and officers of plaintiff for part of this stock, but no agreement was ever reached.

"2. Through mutual acquaintances in Detroit, defendant Zick learned of the interest in plaintiff that Roberts had for sale. Negotiations between Roberts and Zick for the possible purchase by the latter from the former of the Ogden interest in plaintiff commenced late in May, 1956, and continued through June 30, 1956, when Zick agreed to purchase this interest (plaintiff's exhibit 7). The acceptance by all concerned of exhibit 7 as the culmination of this transaction obviates the necessity of any reference to plaintiff's exhibit 6. June 29, 1956, on the way from Kalamazoo to Detroit for what developed to be the final meeting between Roberts and Zick, the latter stopped in Lansing to see defendant Howard J. Stoddard, president of Michigan National Bank and chairman of the board of trustees of its employees' profit sharing trust, purportedly to obtain information concerning the general economic and banking situation in the Port Huron area. Neither

---

* The chancery case and quo warranto proceedings were consolidated upon stipulation. Attached to the report of the judge, acting as referee in the latter, were copies of pretrial proceedings, transcript of testimony, and findings of fact and law.

Zick nor Stoddard testified as to any specific informa-
tion of this type that Stoddard gave Zick on this
occasion, but Zick promised to return and see Stod-
dard at the latter's request 'in the event he (Zick)
decided to go ahead and purchase control of the Peo-
ples Savings Bank.' In the afternoon of June 29,
1956, the possibility of Zick obtaining control of
plaintiff was discussed by the executive committee
of Michigan National Bank and the trustees of its
employees' profit sharing trust, and Stoddard was
authorized to deal with Zick for this control in the
event he returned.

"3. June 30, 1956, plaintiff's exhibit 7 was exe-
cuted by Zick and Ogden whereby the former agreed
to purchase the latter's controlling interest in plain-
tiff on certain stated conditions. The entire day was
spent working out the deal in the offices of Ogden's
attorneys; Zick did not have independent counsel,
although he asked the advice of a friend before sign-
ing plaintiff's exhibit 4.*  July 2 or 3, 1956, Zick ad-
vised Stoddard by telephone that he had concluded a
deal for control of plaintiff and if Stoddard was still
interested, Zick would like to come and see him. July
5, 1956, Stoddard and Zick executed plaintiff's exhibit
8,† and the earnest money Zick had paid Ogden ($5,-
000) was returned to him by Michigan National.
July 20, 1956, Zick closed his purchase of the Ogden
interest in plaintiff with funds furnished by Michi-
gan National Bank ($460,000 received by Zick July
19, 1956), and left the stock certificate together with
an executed blank assignment with defendant Fairles
at Michigan National's Lansing office. The $460,000
was more than enough to cover the Ogden purchase
but was insufficient to make that purchase and pay
Zick and Roberts $25,000 each, as provided by the
plaintiff's exhibit 8.†  A further sum of $150,000
was furnished Zick by Michigan National July 23,

---

* Agreement between Texas Research Corporation (Roberts) and
Zick. June 14, 1956.

† July 5, 1956, agreement between Zick and Trust, hereinafter in
this opinion quoted in full.

1956, and $22,000 additional was similarly furnished September 12, 1956. Zick signed no note, notes, or other agreement to repay this $632,000; terms of repayment were not discussed by Zick, Michigan National, or the Trust; no interest was provided for, charged, or paid; Zick's accounting to the Trust of how this money was used demonstrates it was pursuant to the terms of plaintiff's exhibit 8.*

"4. July 24, 1956, Ogden resigned as director and president of plaintiff; Zick was elected in his stead and signed a director's oath. Public announcement was made of the change, which indicated Zick was moving to Port Huron and was assuming full charge of plaintiff. No disclosure was made of Zick's dealings with Michigan National, Stoddard, Fairles, or the Trust; Ogden would not have sold to Zick had he known of such dealings. Plaintiff had no knowledge of these dealings until the directors' meeting of September 25, 1956, at which time, they were advised by Stoddard that the Trust owned 2/3 of plaintiff's stock, and with the approval of the State banking commissioner and the comptroller of currency, the Trust proposed voting its stock for liquidation of plaintiff, with Michigan National purchasing plaintiff's assets, assuming its liabilities and personnel. Zick continued to buy plaintiff's stock and to leave it at Lansing with Fairles together with executed blank assignments until he acquired a little less than 2/3 of plaintiff's stock. He made a final account with the Trust of the funds furnished by Michigan National on September 14, 1956, and signed a resignation as director and president of plaintiff September 21, 1956.

"5. July 5, 1956, when plaintiff's exhibit 8* was executed, Stoddard considered Zick to be the owner of a controlling interest in plaintiff and knew he would become its president. Stoddard's purpose in making the deal with Zick was to be able to liquidate plaintiff and to absorb it into the Michigan National system.

---

* July 5, 1956, agreement between Zick and Trust, hereinafter in this opinion quoted in full.

"There are many other facts in this voluminous record, some controverted and some uncontroverted; they have not been ignored by this court but rather eliminated as not pertinent to decision after analysis of the whole record. From these pertinent facts and the inferences logically to be drawn therefrom, this court concludes as follows:

"1. There was discussion June 29, 1956, between Zick and Stoddard of a plan, scheme, or agreement whereby Michigan National interests could obtain control of plaintiff.

"2. This discussion became a plan, scheme, or agreement July 5, 1956, with the execution of plaintiff's exhibit 8 to accomplish indirectly what Michigan National could not do directly on the open market, *viz:* acquire control of plaintiff for the purpose of its liquidation.

"3. The transaction was handled through the Trust, not as a profitable investment for the Trust, except as that might become necessary to justify the investment, but rather because the Trust was available and suitable for the purpose.

"4. The activities of Zick, Stoddard, the Trust, and the other defendants with respect to plaintiff and its stock from July 5, 1956, through September 25, 1956, were pursuant to and in fulfillment of the plan of July 5, 1956."

Although, as we have indicated, we find support in the record for all of the facts precisely recorded by the trial judge and for the 4 basic conclusions which he reached, the recital quoted hardly gives the full flavor of this entire transaction. For example, it does not reveal the somewhat stubborn determination of the long-time president of Peoples Savings Bank, Ogden, when he found himself not "getting any younger" and decided to sell his bank stock, not to sell his stock other than to someone "in whom I have confidence as my successor for the good of the bank, its stockholders, and the community of Port

Huron." Nor does it disclose the equal or greater stubbornness of Ogden's codirectors in resisting the ultimately proposed dissolution.

Nor does it reveal the astonishing rapidity of decision on the part of trustees of the Michigan National Bank Employees' Profit Sharing Trust in authorizing the purchase of controlling stock in a bank the same day the matter was first broached. Or the equally surprising willingness of Mr. Zick to sign a purchase agreement when he personally had available less than a fourth of the funds it required him to pay.

Thus, from the testimony, it appears that Mr. Howard J. Stoddard, president of the Michigan National Bank, first knew of Leonard Zick's possible purchase of Ogden's stock as a result of the conference on June 29th. Yet, it also appears from Mr. Stoddard's testimony, that there was a meeting of the Employees' Profit Sharing trustees following Mr. Zick's visit on June 29th, at which a complete report of the proposed transaction was made and Stoddard was given authority to purchase the controlling interest in the Peoples Bank at a price of not to exceed 10% over book value.

Apparently, in ignorance of this decision but on the very next day, Mr. Zick signed an agreement which committed Mr. Ogden to sell his stock at $43 a share, in the sum total of not less than 10,100 and not more than 10,500 shares. Although subject to some conditions, the agreement also purported to bind Mr. Zick to pay a minimum of $434,300 for the stock, and $5,000 was actually paid by him as earnest money.

The record seems to disclose clearly that as of the date in question, Mr. Zick personally had no more than $80,000 in cash available for such a transaction.

On July 5th, however, an arrangement was put in writing which guaranteed the availability of the

necessary cash. It was an agreement signed between Zick, personally, and Stoddard, as chairman of the Michigan National Bank Profit Sharing Trust. We quote it in full:

"Lansing, Michigan
July 5, 1956

"Mr. Leonard O. Zick
729 West South Street
Kalamazoo, Michigan

*"Dear Mr. Zick:*

"It is our understanding that you hold a purchase agreement permitting you to buy no less than 10,100 shares and not more than 10,500 shares of common stock of the Peoples Savings Bank of Port Huron, Michigan, at a price of $43 per share. This purchase agreement which you have obtained from Mr. Myron F. Ogden is dated June 30, 1956, and is good until August 28, 1956. We also understand that you have paid $5,000 as earnest money, to apply upon the purchase price upon consummation of the agreement.

"We are willing to reimburse you at this time for the $5,000 of earnest money in consideration of your agreeing to sell us at least 10,100 shares but not more than 10,500 shares of the stock of the Peoples Savings Bank of Port Huron at a price of $43 a share. The earnest money will be applied as a part payment on the total purchase price. We will pay you a commission of $25,000, and also pay you $25,000 for the services rendered you by Mr. A. S. Roberts, president of the Texas Research Corporation of Kansas City, through whom you obtained this stock purchase agreement. Prior to the closing date, we will make available to you funds required to purchase not less than 10,100 shares or more than 10,500 shares, and at the same time pay you the commissions as outlined above.

"We would also like you to obtain at least another 3,000 shares of stock in the Peoples Savings Bank of Port Huron at the same price of $43 per share, and will pay you a 10% commission for the purchase of

this additional stock. We will be willing to pay you for this additional stock, in whole or in part, plus 10% commission, as soon as it is delivered to us in proper form.

"Very truly yours,
"MICHIGAN NATIONAL BANK PROFIT
SHARING TRUST
/s/ H. J. STODDARD
ACCEPTED:                "Chairman
/s/ LEONARD O. ZICK"

At the time of this contract, the Michigan National Bank Profit Sharing Trust agreement provided in part as follows:

"9. The executive committee of the Bank shall act as trustees and shall be responsible for the administration and investment of the funds in the 'Michigan National Bank Profit Sharing Trust Account.' The trustees will not be entitled to any compensation for services performed in connection with the Trust and will not be liable for any act or neglect with regard to the Trust, except their own wilful misconduct or gross negligence. A majority of the trustees present at any meeting will constitute a quorum and a majority of the quorum may transact any business. The trustees will keep accurate records of all contributions or other funds received by the Trust and of all investments of the Trust, and such other or further records as the trustees deem necessary or convenient for the administration of the Trust.

"10. The trustees may use the funds in the 'Michigan National Bank Profit Sharing Trust account' to purchase stock of the Michigan National Bank, or of any other bank or banking association, or of any lawfully organized and existing corporation, and at their discretion to sell such stock, or to hold such funds on deposit in the Bank. The trustees are authorized to vote the stock purchased by the Trust and registered in the name of the 'Michigan National Bank Profit Sharing Trust account' at all stockholders' meetings of such banks and corporations. The trustees are

authorized to borrow funds to be used by the Trust if in their opinion it is advisable to borrow such funds, and to pledge assets of the Trust to secure such borrowings. · *   *   *

"12. No part of the corpus or income of the Trust shall at any time revert to or in any way become the property of the Bank, nor shall such trust funds be used, directly or indirectly, for any purpose whatsoever other than the exclusive benefit of the eligible staff members or their estates.   Other provisions of this agreement may be amended by the trustees, with the approval of the board of directors of the Bank.
*   *   *

"14. The 'Michigan National Bank Profit Sharing Trust account' is intended to meet the requirements of section 165(a)* of the internal revenue code and therefore be exempt from Federal taxes on its income.   Contributions to the 'Michigan National Bank Profit Sharing Trust account' will be subject to the limitations set forth in section 23(p)* of the internal revenue code and therefore the amount to be credited to the 'Michigan National Bank Profit Sharing Trust account' will be reduced to the extent necessary in any year to provide the maximum contributions for such year within such limitations."

From these quoted paragraphs, it appears that the trustees had the right to make "investments," that this right included purchasing stock of both the Michigan National Bank "and of any other bank or banking association," but that all such purchases must meet the requirement that they not be used "directly or indirectly, for any purpose whatsoever other than the exclusive benefit of the eligible staff members or their estates."

A relevant portion of Mr. Stoddard's testimony pertaining to the purposes of the July 5th agreement follows:

---

* References are to 1939 code.   See 26 USC (1952 ed), §§ 23(p), 165(a).   For current provisions, see 26 USC (1958 ed), §§ 404, 401, 501.—Reporter.

"*Q.* Did your trustees on the 29th of June, Mr. Stoddard, discuss the purchase of Peoples Savings Bank stock as an investment?

"*A.* Only as a temporary investment and as a means to an end.

"*Q.* Of what end, sir?

"*A.* To merge it with the Michigan National Bank.

"*Q.* Through liquidation?

"*A.* Yes.

"*Q.* Any other way you could have done it?

"*A.* No, the only way we knew at the time that we could have made it a part of the Michigan National Bank was by a purchase of assets and assumption of liability.

"*Q.* And that would involve a liquidation of the Peoples Savings Bank?

"*A.* It would result in liquidation. The assets would be taken over into the Michigan National Bank and all of the deposits would be taken over to the bank and the liabilities would be assumed by the bank, yes.

"*Q.* Did the trustees discuss these features of the proposal at that meeting?

"*A.* Yes, we did, or they did.

"*Q.* They were talking about it as trustees or as members of the executive committee?

"*A.* They were talking about it in the latter sense first as trustees. The Trust was the only one that could purchase the stock, the Bank could not.

"*Q.* And did the trustees at this meeting on June 29th discuss any advantage to the Michigan National Bank from this transaction?

"*A.* It did."

In pursuance of the July 5th agreement (although without disclosure of it to anyone in Port Huron so far as this record discloses), Zick proceeded to complete the purchase of the Ogden stock. Funds for this, and subsequent purchases, were placed at his disposal by the Michigan National Bank by transfer through the First National City Bank of New York,

to the Chemical Corn Exchange Bank, to the Peoples Savings Bank of Port Huron. By July 20th, Zick had possession of 10,439 shares of Peoples Savings Bank stock as a result of the Ogden purchase. On July 20th, he left said stock with a vice president of the Michigan National Bank in Lansing, along with a stock assignment signed by him.

On July 24th, Mr. Ogden (who had throughout the transaction been assured that he was selling his stock to someone who was interested in the future of the Peoples Savings Bank and the future of Port Huron, and not to the Michigan National Bank) introduced Leonard Zick to his board of directors as his successor on the board who would thenceforth represent a majority interest of the bank's stock, and suggested that he be elected president of the bank. As a result, Mr. Zick was elected.

Mr. Zick, in turn, on that day and successive days, let it be known that he was enthusiastic about the future of the Peoples Savings Bank, and Port Huron, and that he intended, as quickly as possible, to move his family to Port Huron and take up a permanent residence there.

On July 24th, at that first meeting, Mr. Zick signed an oath of office as director of the bank, which recited:

"Form S.B.D. 114

"STATE OF MICHIGAN   }
"County of ST CLAIR   }   "OATH OF DIRECTOR

"I, the undersigned, Director of the Peoples Savings Bank of Port Huron, Michigan, in the State of Michigan, do solemnly swear that I will diligently and honestly perform the duties of my office, and that I will not knowingly violate, or permit to be violated, any provisions of the Michigan financial institutions act, and that I am the owner in good faith and in my own right of shares of the capital stock of the Bank

as required to qualify me for such office, standing in my name on the books of the bank, and that such stock is not pledged as security for any debt.

"/s/ LEONARD O. ZICK
Leonard O. Zick"

Although Zick requested resignations of all the members of the board of directors, none was forthcoming.

Zick continued to function as president of Peoples Savings Bank until some time in September, 1956. During the interim he continued to solicit and purchase Peoples Savings Bank stock at $43 a share, and he continued to represent to the community at large that he was the principal in the stock purchases.

On September 14th, Zick made his final accounting to the Trust, showing that he had purchased 13,141 shares under the July 5th agreement. Stoddard called him and told him that was enough. On September 13th, Stoddard met with the advisory board of Michigan National's Port Huron branch, told them of the plan for liquidation of Peoples Savings Bank, and received their approval. On September 14th, he met with the board of directors of Michigan National Bank and received their approval likewise.

On September 19th, Zick first revealed Michigan National's interest in the Peoples Savings Bank stock to Marshall Campbell, chairman of Peoples Savings Bank's board of directors. Zick told him that he had sold his stock to the Michigan National Trust, that he was giving Stoddard his resignation, and that Stoddard would be at the September 25, 1956, meeting of the board to announce his plans.

At the meeting on September 25th, Mr. Stoddard was present, Mr. Zick was not. Stoddard announced the ownership by the Trust of 2/3 of the stock of Peoples Savings Bank, and the intention of voting the stock for dissolution. He told the directors that

the assets would be purchased by Michigan National Bank at a price sufficient to pay each Peoples Savings Bank shareholder $43 a share for his stock. He also announced that Michigan National Bank would assume all deposits, assets, and liabilities, take in all the Peoples Savings Bank employees (with full service credits for pension purposes), and make places on the advisory board for all directors.

At the meeting, Director McMorran asked Mr. Stoddard why he bought the Peoples Savings Bank. McMorran testified thus about the exchange:

"*Q.* Did anyone ask Mr. Stoddard why he had bought the Peoples Savings Bank?

"*A.* Yes, sir, I did.

"*Q.* Did he answer?

"*A.* Yes, he did.

"*Q.* What did he say?

"*A.* He said—I can't give the chronology, but he said that one reason they bought the bank was to prevent control from falling into the hands of individuals in Detroit or Chicago indicating that they were perhaps undesirable, presumably, to the community. Further, that his aim or his ambition was to see that the Michigan National Bank expand and expand and in effect to become the Bank of America of Michigan.

"*Q.* Did he explain what he meant by that?

"*A.* I think in explanation he said perhaps I can illustrate by quoting from Tolstoy to the effect that when a man has 1 acre he wants 2, when he has 2 acres he wants 3 and when he has 3 acres he wants 4 but a dog is satisfied with only 1.

"*Q.* Did he give any other explanation of the purpose or the reason that he had bought the Peoples Savings Bank?

"*A.* Yes, he indicated that the day of the small bank, in fact, he said that the day of the small bank is doomed and the smaller banks could not compete with a larger and more efficient institutions."

The directors nonetheless were unpersuaded and filed this suit in chancery, meanwhile seeking and being granted temporary injunctive relief against the threatened dissolution.

We find from this record that there was a plan formulated by the defendants to acquire 2/3 of the stock of Peoples Savings Bank; that the principal party in interest was the Michigan National Bank as represented by its president and the executive committee of its board of directors; that the purpose of the plan was the dissolution of Peoples Savings Bank for the economic benefit of Michigan National's Port Huron branch; that, in the events which have been related, defendant Zick and defendant Michigan National Bank Profit Sharing Trust were used as agents by the principal Michigan National Bank to accomplish the stock acquisition and to attempt the liquidation of the Peoples Savings Bank.

The plan described above violated the statutory or common law of the State of Michigan in a number of ways:

(1) The plan required defendant Zick to execute a false oath as a member of the board of directors of Peoples Savings Bank in violation of sections 63 and 64 of the Michigan financial institutions act (CL 1948, §§ 487.63, 487.64 [Stat Ann 1957 Rev §§ 23.803, 23.804]). These sections read:

"Sec. 63. Every director shall be the bona fide owner in his own right of shares of the capital stock of such bank, having a par value in the aggregate of not less than $1,000: Provided, however, That every director in a bank having a capital of $25,000 or less shall be the bona fide owner in his own right of shares of the capital stock of such bank, having a par value in the aggregate of not less than $300.

"Sec. 64. Every director when elected shall take and subscribe an oath that he will diligently and honestly perform his duties in such office, and will

not knowingly violate, or permit to be violated, any provisions of this act, and that he is the owner in good faith and in his own right of stock in the bank, as required to qualify him for such office, standing in his name on the books of the bank, and that such stock is not pledged as security for any debt. Such oath shall be transmitted to the commission for filing."

At the time Zick took the oath as director and became president, it is plain that he was not "the owner in good faith and in his own right" of a single share of Peoples Savings Bank stock.

(2) The plan required defendant Zick to violate his oath of office requiring that he "honestly perform his duties," by perpetrating a false masquerade as Peoples Bank president upon the bank and the directors and stockholders thereof as to whom he stood in a fiduciary relationship, while he was actually serving as agent of a competitor bank and was seeking to destroy the institution he purported to serve.

The representations made by defendant Zick as to majority stock ownership, interest in Port Huron, intention to live there and perform his duties as bank president smack of common-law fraud. They were false. He knew it when he made them. They were material. They were intended to be relied upon, and they were. We note, of course, that no stockholder who sold his stock to defendant Zick is before us as a plaintiff. But the obligation of honest performance of duties on the part of a bank president under the statute cited runs to the bank itself, as well as to its stockholders as individuals; and the bank, through its duly constituted board of directors, is the plaintiff in the chancery action.

(3) The plan required the voting of 2/3 of the Peoples Savings Bank stock for dissolution, under CL 1948, § 487.99 (Stat Ann 1957 Rev § 23.852). The

specific statutory language applicable to these facts is:

"The provisions of this section with respect to publication of notice shall not apply to any bank in voluntary liquidation which disposes of sufficient of its assets to a State or national bank to pay its creditors in full, or in case all of the liabilities are assumed by such State or national bank."

The circuit judge found that the plan was "an attempt to circumvent the true application of the provisions of the financial institutions act with respect to voluntary liquidation and sale of assets." He allowed amendments of plaintiff's pleadings after the close of the trial to conform them to the proofs on this point.

The State banking commissioner has exclusive jurisdiction to institute all involuntary proceedings to dissolve a bank. CL 1948, §§ 487.115–487.123 (Stat Ann §§ 23.868–23.876); *American State Bank of Detroit* v. *Aaron,* 271 Mich 147 (100 ALR 1266); *Stewart* v. *Algonac Savings Bank,* 263 Mich 272. No such proceedings are involved herein.        •

We might well agree with the circuit judge that this record does not disclose "voluntary" dissolution as contemplated by the Michigan financial institutions act (CL 1948, § 487.99 [Stat Ann 1957 Rev § 23.852]).

It is obvious from this record that the bank dissolution contemplated by defendants' plan pertained to a successful banking institution which was in no financial trouble. It also appears that the proposed voting of the Trust's shares of stock for dissolution was at the dictation of the executive committee of the Michigan National Bank, and not a "voluntary" act of the Trust itself in the exclusive interest of its beneficiaries.

We do not, however, agree with the circuit judge in planting decision of this case upon this issue. The issue was not pleaded, briefed, or argued at hearing below. It was first raised in the circuit judge's opinion after close of proofs, at which time plaintiff and the attorney general were given an opportunity to amend their pleadings. The discretion given the circuit judge by Michigan Court Rule No 25 and CL 1948, § 616.1 (Stat Ann § 27.838), is broad; but we believe that the issue was one of substance and that, if amendment were to be allowed in the interest of justice, defendants should likewise have been given opportunity to answer, reopen proofs, and brief and argue the issue prior to decision.

We refrain from granting such an opportunity as to this issue now only because we consider our holdings as to other issues entirely dispositive of the litigation.

(4) The plan as formulated and executed represented a violation of the Michigan National Profit Sharing Trust agreement by its trustees and an *ultra vires* use of the Trust as an instrument of Michigan National Bank policy.

In this regard, we take note of defendants' affirmative defenses:

(a) That the Trust was authorized to invest in stock of other banks; and

(b) That the Trust was an affiliate of a national bank within the meaning of 12 USC (1958 ed), § 221a.

The purchase of Peoples Savings Bank stock was not an "investment" within the terms of the trust agreement. On the contrary, it clearly represented a use of trust funds for a purpose other than "the exclusive benefit of the eligible staff members." The record shows that this purchase was made for the purpose of liquidation of plaintiff bank and for the benefit of Michigan National Bank. The lack of concern for the terms of the trust agreement is amply

demonstrated by the fact that the result of all of the written contracts in the transaction would be a substantial net loss to the Trust. The purchase was clearly beyond the authority given the trustees by the trust agreement.

In saying this, we are cognizant of the fact that in this litigation no beneficiary of the Trust is shown to be complaining; and that the record discloses much testimony calculated to show that Michigan National's president, Stoddard, intended that the trust fund would ultimately achieve a quick profit on this deal. His cross-examination shows this question and answer:

"*Q.* Now, compensated, would you care to explain that? You felt the Trust should be compensated; you mean because it did this job for the Michigan National Bank it should be compensated?

"*A.* Yes, I thought the Trust had a right because it had purchased the stock, it had assembled the stock, so the Trust in offering the stock to the Michigan National Bank should receive a profit for that work which the Trust had done, yes."

In our view, however, neither of these facts justifies the use of the Trust as an instrument of the bank's economic policy in violation of the clear prohibition of the trust agreement.

Nor do we believe that the Trust can be held to be a national bank affiliate within the meaning of 12 USC (1958 ed), § 221a(b). The relevant language is, "the term 'affiliate' shall include any corporation, business trust, association, or other similar organization." The Michigan National Profit Sharing Trust agreement shows this to be organized as a tax-exempt employee pension trust. It is not a corporation or association. Equally, it is not a "business trust" or "other similar organization." The business or Massachusetts trust represents the employment of

the form of a common-law trust for the purpose of carrying on business enterprises. *Goldwater* v. *Oltman,* 210 Cal 408 (292 P 624, 71 ALR 871). Such trusts are generally taxable under the internal revenue code. *Hecht* v. *Malley,* 265 US 144 (44 S Ct 462, 68 L ed 949).

The Michigan National Profit Sharing Trust agreement grants no power to the trustees to engage in business generally. And the agreement is drawn specifically to take advantage of Federal tax exemption under the internal revenue code.

We believe the Trust to be an employee pension trust established and specifically authorized by State law. CL 1948 and CLS 1956, § 555.301 *et seq.* (Stat Ann 1957 Rev § 26.82[1] *et seq.*). While it has been designed to take advantage of tax exemption under the Federal internal revenue code (Int Rev Code 1954, 26 USC [1958 ed], § 401), it is neither a national bank affiliate nor holding company under 12 USC (1958 ed), § 221a, nor organized or chartered under any Federal statute.

The relationship of this Trust to the Federal government is accurately portrayed by language of the United States supreme court in *Morgan* v. *Commissioner of Internal Revenue,* 309 US 78, 80 (60 S Ct 424, 84 L ed 585):

"State law creates legal interests and rights. The Federal revenue acts designate what interests or rights, so created, shall be taxed."

(5) Since we hold that the principal in the acquisition of this stock was at all times the Michigan National Bank, we should also point out that the purchase was violative of both State and Federal law.

Thus, where State law (CLS 1956, §§ 450.10, 450.94 [Stat Ann 1959 Cum Supp §§ 21.10, 21.95]) does not permit any corporation to own bank stock

(except in circumstances not involved herein), a Federal statute (12 USC [1958 ed], § 24) prohibits national banks from purchasing the stock of any other corporation.* This latter fact, however, does not prevent the Michigan attorney general from enforcing a Michigan law. *Cf. Noel Estate, Inc.,* v. *Commercial National Bank in Shreveport* (CCA 5), 232 F2d 483; *Thompson* v. *Saint Nicholas National Bank,* 146 US 240 (13 S Ct 66, 36 L ed 956).

As far as our present case is concerned, the Federal law and the State law both prevent the Michigan National Bank from doing, either directly or by agent, that which it set out to accomplish by the plan described. We find no conflict between these statutes.

National banks are subject to State laws which do not interfere with the purposes of their creation, or conflict with express powers given them by Federal law. *First National Bank in St. Louis* v. *State of Missouri,* 263 US 640 (44 S Ct 213, 68 L ed 486).

We now turn to the basic purpose of the plan. Simply stated, it was for defendants to acquire the necessary stock of plaintiff bank in order to vote dissolution and thus eliminate a competitive bank for the purpose of leaving Michigan National's Port Huron branch as the only institution in the general banking business in Port Huron.

Michigan's antimonopoly laws provide:

"That a trust is a combination of capital, skill or arts by 2 or more persons, firms, partnerships, corporations or associations of persons, or of any 2 or more of them, for either, any or all of the following purposes:

"1. To create or carry out restrictions in trade or commerce; * * *

---

* For similar prohibitory language as to State banks, see CLS 1956, § 487.33 (Stat Ann 1957 Rev § 23.761).

"5. * * * Every such trust as is defined herein is declared to be unlawful, against public policy and void." CL 1948, § 445.701 (Stat Ann § 28.31).

"All combinations of persons, copartnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy and illegal and void." CL 1948, § 445.762 (Stat Ann § 28.62).

Monopoly may be said to be the result of the practical elimination of effective business competition which thereby creates a power to control prices to the harm of the public. *Attorney General, ex rel. James,* v. *National Cash Register Co.,* 182 Mich 99 (Ann Cas 1916D, 638); *Love* v. *Kozy Theatre Co.,* 193 Ky 336 (236 SW 243, 26 ALR 364); *Pocahontas Coke Co.* v. *Powhatan Coal & Coke Co.,* 60 W Va 508 (56 SE 264, 10 LRA [NS] 268, 116 Am St Rep 901, 9 Ann Cas 667).

It appears beyond question that this was the defendants' objective in relation to the field of general banking in Port Huron.

Practices such as price fixing, division of markets, group boycotts, and tying arrangements have been held to be unlawful in and of themselves. *United States* v. *Socony-Vacuum Oil Co., Inc.,* 310 US 150, 218 (60 S Ct 811, 84 L ed 1129); *International Salt Co., Inc.,* v. *United States,* 332 US 392 (68 S Ct 12, 92 L ed 20); *Northern Pacific R. Co.* v. *United States,* 356 US 1, 5 (78 S Ct 514, 2 L ed 2d 545).

See, also, *Hunt* v. *Riverside Co-Operative Club,* 140 Mich 538 (112 Am St Rep 420).

Similarly, an agreement or scheme, the manifest object of which is to acquire control over a competitor through its capital stock for the purpose of ex

tinguishing competition, is *per se* in violation of the antimonopoly laws. *United States* v. *American Tobacco Co.*, 221 US 106 (31 S Ct 632, 55 L ed 663) ; *Northern Securities Co.* v. *United States*, 193 US 197, 327 (24 S Ct 436, 48 L ed 679) ; *United States* v. *Crescent Amusement Co.*, 323 US 173, 188, 189 (65 S Ct 254, 89 L ed 160).

See, also, *Bigelow* v. *Calumet & Hecla Mining Co.* (WD Mich ND), 155 F 869.

It would appear that defendants' plan to acquire 2/3 of the stock in order to vote dissolution of plaintiff bank for the purpose of eliminating its only general banking competition represented a *per se* violation of the quoted provisions of the Michigan antimonopoly statutes.

Defendants, however, contend: (1) that the Michigan antimonopoly law does not apply to banking; (2) that the Federal antimonopoly laws preempt the entire field of interstate commerce; and (3) that the Federal banking statutes pre-empt the field and deprive this Court of jurisdiction over the parties.

As to the first of these arguments, it is clear that the State antimonopoly laws contain no specific exemption as to banking. Nor is banking, in our view, generally exempt from the antimonopoly laws. *Transamerica Corporation* v. *Board of Governors of the Federal Reserve System* (CCA 3), 206 F2d 163, cert den 346 US 901 (74 S Ct 225, 98 L ed 401) ; *United States* v. *Mortgage Conference of New York*, CCH 1948–1949 Trade Cases, § 62,273; *United States* v. *Morgan* (SD NY), 118 F Supp 621; *State, ex rel. Hadley*, v. *Bankers Trust Co.*, 157 Mo App 557 (138 SW 669) ; Berle, "Banking under the Anti-Trust Laws," 49 Col L Rev 589.

In this regard, we note Toulmin's argument that banking should not be subject to antimonopoly controls:

"Banking is not a business in which monopoly is ever possible. It primarily deals with the furnishing of personal services of which banking is a superb example. You can no more monopolize personal services and its quality, which varies with individuals, than you can monopolize any other product of nature.

"Money is so fluid that if it were in the hands of 1 person in the morning, to use it, it would be necessary to distribute it widely by nightfall. The antitrust laws should only apply to *predatory practices, agreements, or combinations which are per se restrictive and illegal* outside of the question of monopoly. Under such considerations with such matters properly regulated, the size of the bank should be of secondary consideration." (Emphasis supplied.) 5 Toulmin's Anti-Trust Laws, Banking, § 2.1, p 57.

The businessman refused a loan by his home-town bank might be hard to convince that banking monopoly is never possible. And the italicized sentence appears to us to imply that claim of exemption of banking rests, at least in part, upon the suggestion that the practices referred to by Toulmin do not occur in the banking field. This record presents much evidence to the contrary.

Much of the Toulmin argument, however, is based upon the comprehensive character of Federal and State regulation of banking. Defendants claim that the Michigan financial institutions act (CL 1948 and CLS 1956, § 487.1 *et seq.* [Stat Ann 1957 Rev § 23.711 *et seq.*]) is such a comprehensive act, and that since it was adopted after the Michigan antimonopoly statutes (CL 1948, § 445.701 *et seq.* [Stat Ann § 28.31 *et seq.*]), it must be held to have superseded and repealed any possible effect these latter statutes might have as to banking.

It is clear that just as the antimonopoly act contained no specific exemption as to banking, neither does the Michigan financial institutions act contain

a specific exemption as to monopoly. The addition of such exemption, if consistent with legislative intent, is so simple and so much to be expected, that the omission seems to us of great significance in determination of this issue.

Nor does our examination of the scope of the Michigan financial institutions act uphold the "comprehensive" argument advanced to us by defendants. For example, the power vested in the banking commissioner by sections 99 and 112 of the Michigan financial institutions act (CL 1948, §§ 487.99, 487.112 [Stat Ann 1957 Rev §§ 23.852, 23.865]) appears to be the examination of the proposed liquidation for the purpose of protecting depositors and creditors. If the public is protected from the sort of monopolistic practice in banking demonstrated in this case, the protection is not to be found in the Michigan financial institutions act.

Defendants likewise argue with vehemence that in many other situations under express authority of the banking commissioner and authorization of the Michigan financial institutions act, 1-bank cities have been created or are being maintained in Michigan. We have no doubt that the Michigan financial institutions act has established, as a matter of State policy, a concern for the stability and economic soundness of the banks in the State. These considerations have in some situations been placed above the maintenance of free and unlimited competition. We recognize, too, this State policy must be read in conjunction with any application of the antimonopoly law to banking.

The purpose, however, is to protect the public against imprudent banking, not "to deter competition or foster monopoly." *Moran* v. *State Banking Commissioner*, 322 Mich 230, 243.

What prevents the application of this argument to this case is the fact that Port Huron was supporting, and obviously could continue to support, 2 gen-

eral banking institutions. This was not a liquidation founded on economic necessity or demanding State approval on grounds of protection of depositors or creditors of any bank.

Nor do we have before us any fact situation presenting the question of creation of monopoly through voluntary merger of previously competitive banks with banking commission approval under procedures established by the Michigan financial institutions act. While declining to pass on an issue clearly not before us, we note that if there are, or have been, other unrestrained violations of the antimonopoly laws, this fact could be of no benefit to defendants. *Society of Good Neighbors* v. *Mayor of Detroit,* 324 Mich 22; *Attorney General, ex rel. James,* v. *National Cash Register Co., supra.*

Repeals by implication are generally not favored. *Washtenaw County Road Commissioners* v. *Public Service Commission,* 349 Mich 663; *People* v. *Buckley,* 302 Mich 12; *Edwards* v. *Auditor General,* 161 Mich 639. And we find nothing in the history or language of these 2 pieces of legislation to support an argument of legislative intention of implied repeal.

We hold that the Michigan financial institutions act did not either expressly or by implication exempt banking from the operation of the Michigan antimonopoly laws.

Nor do we believe that in this fact situation the Federal Clayton and Sherman acts\* so pre-empt the field of monopoly regulation as to deny State-court jurisdiction.

Michigan has long prohibited monopolies both under common law (*Richardson* v. *Buhl,* 77 Mich 632; *Hunt* v. *Riverside Co-Operative Club, supra,* 548), and by statute (CL 1948, § 445.701 *et seq.* [Stat Ann

---

\* Clayton act of October 15, 1914, ch 323, 38 Stat 730, as amended.

Sherman act of July 2, 1890, ch 647, 26 Stat 209, as amended.

§ 28.31 *et seq.*] ) ; *Attorney General, ex rel. James,* v. *National Cash Register Co., supra; Mulliken* v. *Naph-Sol Refining Co.,* 302 Mich 410. Beginning in 1899, the common-law prohibition was translated into statutory form. Antimonopoly statutes are an exercise of the police power of the State. *German Alliance Insurance Co.* v. *Hale,* 219 US 307 (31 S Ct 246, 55 L ed 229) ; *Associated Merchants of Montana* v. *Ormesher,* 107 Mont 530 (86 P2d 1031). While in many ways our Michigan statute parallels and augments the Clayton and Sherman acts, in no way does it conflict with them.

Further, the monopolistic practice sought to be restrained in these cases is predominantly local in its effect. We recognize, of course, that all banking has some aspects of interstate commerce. But 90% of the depositors and of the transactions with which the plaintiff bank and the Port Huron branch of defendants' bank are concerned are purely local. The effect of removing general banking competition as to interest on deposits and bank charges on individual and commercial loans will be overwhelmingly local.

The courts have repeatedly recognized the jurisdiction of the State to enforce its own antimonopoly legislation in situations where the effect of the monopoly was primarily intrastate. *Standard Oil Company of Kentucky* v. *State of Tennessee,* 217 US 413 (30 S Ct 543, 54 L ed 817); *State of Texas* v. *Standard Oil Co.,* 130 Tex 313 (107 SW2d 550) ; *State of Texas* v. *Racine Sattley Co.,* 63 Tex Civ App 663 (134 SW 400).

Finally, defendants argue that the Michigan antimonopoly statute cannot be applied to them because of the overriding effect of the Federal banking laws.

We note that the victim of defendants' plan was a State bank, that the impact of the monopoly sought to be created would be overwhelmingly local, and that all of the parties with the single exception of the

Michigan National Bank are State residents or institutions created under and governed by State law.

As we have indicated above, the agency used for the execution of this plan, the Michigan National Bank Profit Sharing Trust, is, in our view, neither a national bank affiliate under 12 USC (1958 ed), § 221a (b), nor an organization organized under or regulated by Federal law. As to it, and the balance of the parties other than defendant Michigan National Bank, State laws are plainly enforceable. (Indeed, if defendants' denial that the trust was used as an agent by Michigan National Bank be accepted, there is real doubt as to whether there is any alternative Federal jurisdiction at all.)

What is left for our consideration as to this question is whether or not the State courts of Michigan can enjoin a violation of State law committed by a Federally chartered bank.

We do not have pointed out to us any State-Federal legal conflict. Nor do defendants cite to us any Federal statute which authorizes the acts which we have held the State law to forbid (with, of course, the exception of 12 USC [1958 ed], § 221a, previously held inapplicable).

Michigan, by enjoining a national bank from destroying a State bank by violation of State laws, does not purport to interfere with Federal regulation of a Federal agency. It merely says that the Federal agency, as it operates within the State of Michigan, must obey State laws passed under the State's police power which in no way conflict with applicable Federal policy. *Lewis, Receiver,* v. *Fidelity & Deposit Co. of Maryland,* 292 US 559 (54 S Ct 848, 78 L ed 1425, 92 ALR 794).

The United States supreme court has put the matter this way:

"National banks are brought into existence under Federal legislation, are instrumentalities of the Federal government and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as Federal agencies or conflict with the paramount law of the United States. *National Bank* v. *Commonwealth,* 9 Wall (76 US) 353, 362 (19 L ed 701) ; *Davis* v. *Elmira Savings Bank,* 161 US 275, 283 (16 S Ct 502, 40 L ed 700)." *First National Bank in St. Louis* v. *State of Missouri,* 263 US 640, 656 (44 S Ct 213, 68 L ed 486):

And Mr. Justice Holmes, in an interstate commerce case, illustrated the principle further:

"It hardly would be an answer to an indictment for forgery that the instrument forged was a foreign bill of lading, or for assault and battery that the person assaulted was engaged in peddling goods from another State." *Standard Oil Company of Kentucky* v. *State of Tennessee,* 217 US 413, 422 (30 S Ct 543, 54 L ed 817).

We do not believe that anything we have said herein is in any way inconsistent with prior consideration of somewhat related problems in *Attorney General, ex rel. State Banking Commissioner,* v. *National Bank of Detroit,* 338 Mich 610, where this Court held that it was without jurisdiction to enforce a Federal law against a national bank.

The remaining question is whether or not the Federal banking statutes constitute such a comprehensive scheme of Federal bank regulation as to preempt State antimonopoly action against any national bank.

Much of what we have previously said in relation to the same argument applied to the Michigan financial institutions act is equally applicable to the

Federal banking laws.  As we read them, they neither authorize what was attempted in this situation nor afford the regulatory body the power to restrain it.

We do not find in the Federal banking statutes a scheme of regulation which includes either permission for or restriction against monopoly practices in banking.

For the reasons we have outlined, we hold that both the objective and the means of execution of defendants' plan were in violation of Michigan's law.  The circuit judge was correct in holding that the plan he found established by the testimony was an illegal conspiracy.  Plaintiffs in both cases carried the burden of proof of showing "a combination of 2 or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal, by criminal or unlawful means." *Veriden* v. *McLeod,* 180 Mich 182, 191.

The proofs show ample grounds both for the plaintiff's chancery action for equitable relief and the attorney general's action in quo warranto in discharge of his statutory duty under PA 1899, No 255, § 2 (CL 1948, § 445.702 [Stat Ann § 28.32]), and under section 13, subds (2) and (5), of the quo warranto chapter of the judicature act (CL 1948, § 638.13, subds (2) and (5) [Stat Ann § 27.2327, subds (2) and (5)]).  *First National Bank in St. Louis* v. *State of Missouri, supra; First National Bank of Bay City* v. *Fellows,* 244 US 416 (37 S Ct 734, 61 L ed 1233), reversing *Attorney General, ex rel. Union Trust Co.,* v. *First National Bank of Bay City,* 192 Mich 640.

In our view of these cases, we find no substantial State or Federal constitutional issue presented.

Finally, as to damages in the chancery action, the circuit judge found that "there is no direct proof in the record that the acts of defendants caused any loss of deposits in plaintiff; plaintiff relied on expert

testimony alone to establish causation." He concluded by holding that plaintiff had not met the burden of proof as to damages.

Our review of the record finds us in agreement with the circuit judge's view of the evidence pertaining to claims of damages due to plaintiff's decline in total deposits. We note, of course, expert witness tabulations of Peoples Savings Bank deposits showing a decline in total deposits in the period following announcement of the defendants' scheme for dissolution. But we also note a decline in total deposits for the Michigan National Bank and a group of comparable banks during the same period.

While it appears that the Peoples Savings Bank total deposits index declined to a greater percentage than did the other 2 indices, the record is devoid of evidence which indicates that this excess decline was caused by the announcement of defendants' scheme. As the circuit judge noted, we find no testimony which asserts that any specific account or accounts were lost thereby. Even more compelling on this score is the cross-examination of plaintiff's witness Alfred S. Cudlip, executive vice president of plaintiff in charge of operations. Cudlip was asked to analyze the drop of Peoples Savings Bank total deposits between September 26, 1956, and December 31, 1956, during a period when the impact of the announcement of the prospective Michigan National take-over would have been greatest. He identified such items as a $283,900 decrease representing Christmas club payments and an $87,000 withdrawal by defendant Zick of his previous deposit as reflected in the decline. He also identified a drop of $868,000 in time deposits as a decline in public fund deposits which followed their normal pattern; and gave similar testimony pertaining to a decrease in United States government demand deposits of $138,000, and United States bank demand deposits of $46,000. Thus, the bank ex-

ecutive in charge of plaintiff's operations identified $1,422,900 of the $1,667,000 decline in deposits in the crucial 3-month period as due to normal operation, or specifically unrelated to announcement of the defendants' scheme.  And he failed likewise to show specific causal relationship as to the balance of the drop.  None of the expert testimony pertaining to growth curves and probabilities served to counter these admissions.

Plaintiff relies as to this issue upon the rule of damages to business stated in *Allison* v. *Chandler,* 11 Mich 542, and reiterated by this Court in *Muskegon Agency, Inc.,* v. *General Telephone Company of Michigan,* 350 Mich 41.  We have applied herein the rule of these 2 cases.  Plaintiff's claims as to damages fail, however, not because the evidence presented did not achieve an impossible exactness and certainty as to amount of damage, but because the total record failed to convince the circuit judge, and fails to convince us, that the decline in deposits shown was caused by the announcement of the contemplated dissolution.

There is no question in our minds but that there is ample proof of impending damage in the planned dissolution of the bank to warrant the injunctive relief sought.  But as to specific money damages in the course of operations, we agree with the circuit judge that plaintiff failed to carry the burden of proof.  It seems very likely that the nature of Michigan National's announcement which promised assumption of all obligations and liabilities, and continuation of employment of all Peoples Savings Bank personnel, tended to mitigate in part the impact which the announcement of dissolution might otherwise have had.  The prompt temporary injunctive relief rendered in this case may likewise have helped to prevent damage.

To turn now to the question of relief in the chancery action, we affirm the decree of the chancellor in the finding of an illegal conspiracy and in the granting of injunctive relief. *Glover* v. *Malloska,* 238 Mich 216 (52 ALR 77); *Hunt* v. *Riverside Co-Operative Club, supra; Dunbar* v. *American Telephone & Telegraph Co.,* 224 Ill 9 (79 NE 423, 115 Am St Rep 132, 8 Ann Cas 57).

We also affirm the order of divestiture and the appointment of a receiver to sell the Peoples Bank stock at public sale to prevent the completion of the scheme for destruction of Peoples Bank. *Standard Oil Company of New Jersey* v. *United States,* 221 US 1 (31 S Ct 502, 55 L ed 619, 34 LRA NS 834, Ann Cas 1912D, 734); *United States* v. *Union Pacific R. Co.,* 226 US 61 (33 S Ct 53, 57 L ed 124); *Schine Chain Theatres, Inc.,* v. *United States,* 334 US 110 (68 S Ct 947, 92 L ed 1245). As indicated in the body of the opinion above, however, we conclude that no defendant should be allowed to bid at the public sale.

We agree with the circuit judge in holding that none of the wrongdoers should be entitled to profit from his wrongs. We affirm the decree in ordering defendant Zick to repay $2,056.09 salary paid him by plaintiff bank, and in awarding damages of $560 for unnecessary audit expense against all defendants. As to the $25,000 fee paid to Roberts, the record shows he was not a party to the conspiracy. Further, he is not a party to this litigation. Plaintiff did not pay this fee and may not recover it.

Likewise, Zick's fees from the purchase of Peoples Bank stock were not paid by plaintiff and may not be awarded to it. We do, however, regard them as recoverable by defendant Trust for the benefit of the trust beneficiaries, but not in this action.

The decree should provide for the dividends on the stock now held by the clerk of the court to be paid to the successful bidder at public sale.

The purpose of the public sale should be to effect divestiture by defendants of all interest in and control of Peoples Savings Bank stock. The proceeds of the sale up to $43 a share should be used to reimburse defendant Michigan National Bank Profit Sharing Trust.

Any proceeds over $43 per share realized from the stock sale should be impounded by the receiver and held by him as constructive trustee for the benefit of claimants of such funds (including present parties and former stockholders) in future proceedings.

In the event of failure of receiver to secure the minimum bid of $43 a share, the chancellor should, on petition filed by the receiver, entertain alternative plans for divestiture not inconsistent with this opinion and enter such further orders as may be required.

The decree of the circuit judge is affirmed as modified.

Judgment in the quo warranto action granting similar relief in terms of injunction, receivership, and divestiture may be entered against all defendants. *People, ex rel. Attorney General,* v. *Michigan Bell Telephone Co.,* 246 Mich 198 (PUR1929B, 455, PUR1929E, 27); *People, ex rel. Attorney General,* v. *Michigan Sanitarium & Benevolent Ass'n,* 151 Mich 452.

Plaintiff in the chancery action having prevailed in all aspects of this appeal, except as to proof of damage, may have costs and attorney fees (not including fees as to expert witnesses on damages) apportioned to reflect our affirmance as to this issue. The cause is remanded for such apportionment by the chancellor, and for the further proceedings called for by the decree as modified.

No costs are allowed in the quo warranto proceeding—only public questions being involved.

DETHMERS, C. J., and CARR, KELLY, and SMITH, JJ., concurred.

BLACK and KAVANAGH, JJ., did not sit.

SOURIS, J., took no part in the decision of this case.